**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff*, | ) ) | |
| vs. | ) ) | Case No. 1:25-cr-00308-MSN |
| ASHLEY J. TELLIS, | ) ) | |
| *Defendant*. | ) ) | |

<u>**DEFENDANT'S OPPOSITION TO MOTION TO REOPEN DETENTION**</u>

Ashley J. Tellis, by counsel, opposes the government's Motion to Reopen Detention.

## I.      INTRODUCTION

More than six weeks ago, on October 21, 2025, the parties jointly asked the Court to accept their agreement to release Dr. Ashley J. Tellis pending trial, with a number of strict conditions in place, including home confinement with GPS monitoring, no passport or travel, and no access to the internet. The Court accepted the parties' agreement, and for the last 45 days Dr. Tellis has meticulously abided by the conditions ordered by the Court.

Now, despite this exemplary test period, the government has changed its mind and asks the Court both to reopen the detention hearing and detain him pending trial. Neither would be justified under the law and circumstances. The relevant bail provision allows the government to reopen the Court's previous decision only if the government can show that it has new information that was (1) "not known" at the time of the original hearing, and (2) is "material" to the question of detention. The government's supposedly new information is largely what it has known, or reasonably could have known, since the October 21 detention hearing, and nothing the government

identifies is both—as the law requires—new *and* material to the issue of detention. The request to reopen should be dismissed outright.

Even if it were appropriate to re-examine detention at this late date, the government may argue only risk of flight, not dangerousness. The bail statute permits the government to argue dangerousness only when the defendant is charged with a crime on a limited statutory list; the instant charge does not appear on that list.

And even if the court entertains the government's dangerousness application, that application does not come close to meeting its requisite burden, clear and convincing evidence, that Dr. Tellis is a danger to the community such that no conditions of release can ensure safety. Though the government's primary argument is danger, the government also fails on its alternative argument that Dr. Tellis presents a flight risk. There clearly are conditions that can, and have, ensured that Dr. Tellis will appear before the Court as ordered. The government's baseless speculations about what Dr. Tellis might or could do cannot carry its burden. Dr. Tellis has strong ties to his family, home, and community, and has since the beginning of this case exhibited complete cooperation and compliance.

At the time of the original bail determination there was no indictment yet in this case. But the government has since obtained an indictment, and in that indictment, Dr. Tellis has been charged with a single count of violating 18 U.S.C. § 793(e) for unauthorized retention of national defense information. This retention charge does not allege or even suggest that Dr. Tellis disseminated the national defense information. Moreover, the indictment names just two documents as the basis for the charge. The government request to detain Dr. Tellis is therefore a request to treat him differently, and worse, than other similarly-situated public servants who have been charged under the same statute for retention—or even for *transmission*—of national defense

information. The Court need look no further than the recent case of John Bolton, who has been charged with 18 counts of both retention and transmission of national defense information under Sections 793(d) and (e), yet the government did not seek pretrial detention, and Mr. Bolton has been released on his personal recognizance without home confinement or electronic monitoring. *United States v. Bolton*, No. 8:25-cr-314-TDC-1 (D. Md. 2025). Dr. Tellis already is under significantly stricter conditions here, despite being charged only with retention, further demonstrating that the government's push now to incarcerate Dr. Tellis pending trial is plainly unwarranted.

For the reasons set forth herein, we ask the Court to deny the government's motion.

## II.     FACTUAL PROFFER IN SUPPORT OF CONTINUED PRETRIAL RELEASE

Defense previously proffered extensive factual circumstances rebutting any suggestion that Dr. Tellis is a flight risk or danger to the community in his initial memorandum in support of pretrial release, ECF No. 14 at 2–7. We restate many of those facts here—along with additional relevant developments—for the Court's convenience.

### 1.     Family and Community Ties.

Dr. Tellis' life is rooted in the Northern Virginia and greater D.C. community, and his family forms the core of his personal life. He has been with his wife, Dhun Tellis, for nearly 46 years. Together they have built a stable and loving household that serves as a foundation not only for themselves but for their three adult children, all of whom reside locally. His 20-month-old granddaughter lives nearby, and a second grandchild is expected in May 2026. Dr. Tellis has been an involved and supportive father and grandfather throughout their lives, and his family depends on his presence.

Beyond his immediate family, Dr. Tellis is an active member of his church parish, where he and his family have attended Mass for over 25 years, sitting in the same pew every Sunday. His

presence is valued by his church community. His local pastor, Father William Metzger, has submitted a letter in support of Dr. Tellis, ECF No. 14-1, confirming Dr. Tellis' longstanding commitment to his faith and the values it upholds—compassion, humility, and service. The loss of his presence would be felt personally and communally.

Dr. Tellis also maintains broad social and professional networks in Northern Virginia and Washington, D.C. His professional relationships extend to former and current U.S. government officials who have frequently relied on his expertise. These relationships are evidence of deep and enduring ties to the community—professional, social, and civic—that weigh strongly against any risk of flight.

2.     <u>Esteemed Career in Public Policy and U.S. Government Service.</u>

Dr. Tellis is a leading scholar in international security, defense strategy, and U.S. foreign policy, with decades of service in both government and think-tank capacities. After arriving in the United States in 1985, Dr. Tellis earned both his master's and doctoral degrees in political science from the University of Chicago. In 1993, he both became a U.S. citizen and began his career at the RAND Corporation, serving as a Senior Policy Analyst and Professor of Policy Studies.

In 2001, under President George W. Bush, Dr. Tellis was appointed Senior Advisor to the U.S. Ambassador to India. He later served as Special Assistant to the President and Senior Director for Strategic Planning and Southwest Asia on the National Security Council. During his tenure, Dr. Tellis played a pivotal role in shaping the U.S.-India civil nuclear agreement—widely regarded as one of the Bush Administration's most significant foreign policy achievements.

In 2003, Dr. Tellis joined the Carnegie Endowment for International Peace, a leading nonprofit organization dedicated to international affairs. Over more than two decades, Dr. Tellis built enduring professional and personal relationships with his colleagues and was deeply committed to the institution's mission.

Since the Bush Administration, he served as a Special Government Employee for the Department of State, providing strategic counsel as a Foreign Affairs Officer. He also supported the Department of Defense (now War) in various roles since the 1990s, including the Office of the Secretary of Defense and the Office of Net Assessment, producing specialized research and reports on issues within his field of expertise. His sustained dedication to public service reflects both his intellectual depth and his commitment to national interests. At his core, Dr. Tellis is driven by a lifelong passion for learning and academic scholarship. His prolific body of work includes the publication of more than 20 books and numerous articles. *See* Curriculum Vitae of Ashley J. Tellis, ECF No. 14-2. He frequently has been invited to testify before Congress and lectured at leading universities around the world, including Columbia, Stanford, Princeton, Brown, UCLA, Johns Hopkins, Oxford, the London School of Economics, Peking University, Tsinghua University, the University of Sydney, and the NATO Defense College. He is widely admired by students and peers alike.

3.  His Prior Interactions with Foreign Persons and International Travel Were Both Lawful and Expected.

In its motion, the government has underscored that Dr. Tellis has met with foreign officials, including Chinese officials, as if that were some terribly incriminating fact. But as a scholar, think-tank fellow, and Special Government Employee with a focus on South Asian foreign policy, a requisite of Dr. Tellis' work was to meet regularly with foreign diplomats, military officials, and others in the international security sphere. For example, over the years, he has liaised with officials from Australia, China, France, Germany, India, Israel, Japan, Pakistan, Russia (pre-invasion of Ukraine), and the United Kingdom—including, at times, at the request of the Department of Defense and Presidential administrations.

As explained by leading U.S. foreign-policy scholar, Dr. Kori Schake, who has held directorships at numerous think-tank projects and has had a distinguished career in the U.S. government, "it is appropriate and indeed expected for foreign policy experts at think tanks to engage directly with foreign government officials—including those of states that are not U.S. allies—in order to perform their roles effectively." *See* Decl. of Kori N. Schake ¶ 5 ("Schake Decl."), ECF No. 14-4.

The government also criticizes Dr. Tellis for accepting token gifts from the Chinese. But the exchange of small tokens at these meetings is "customary," and "it may be considered rude or disrespectful not to offer a small gift as a gesture of appreciation for a meeting or to decline the gift." *Id.* ¶¶ 10–11. These gifts certainly "do not, in themselves, indicate undue influence, bribery, or illicit conduct, particularly when low in monetary value." *Id.* ¶ 11. Dr. Tellis frequently gifts his own published monographs, reports, or books to his meeting guests. Dr. Tellis' job requires him to meet with foreign officials and the offer and acceptance of token gifts—like a bag of teas— is to be expected.

Dr. Tellis was scheduled to speak in Rome the week following his arrest at the NATO Defense College, an institution with which he has a longstanding professional relationship. As part of his regular academic engagements, he was invited to present at the College's "China Seminar" on October 15–16, 2025. *See* Invitation to Dr. Ashley Tellis by the NATO Defense College (Aug. 20, 2025), ECF No. 15. The seminar focused on "The Geopolitical Implications of U.S.-China Competition," and, according to a representative of the College, Dr. Tellis was expected to be the star lecturer. He had planned to bring his family on the trip. Dr. Tellis frequently visits the NATO Defense College in both his capacity as a lecturer and as a member of its Academic Board of Advisors. Such visits are a routine component of his academic and advisory work.

4. <u>Health Considerations.</u>

Dr. Tellis has recently experienced cardiac-related symptoms that necessitated two emergency room visits and medical investigations this fall. He had cardiology evaluations with specialists in the Washington, D.C. area in late October and mid-November. The November appointment resulted in his cardiologist—due to Dr. Tellis' cardiac symptoms—prescribing an anti-inflammatory, a statin, and ordering a CT coronary angiogram, which occurred on November 25 at Fairfax Radiology. Dr. Tellis' cardiologist has not yet provided results from the angiogram. His cardiologist has also ordered blood draws, scheduled for February 2026, to evaluate the impacts of medication prescribed in November.

## III. PROCEDURAL HISTORY

The history of the case demonstrates that Dr. Tellis has cooperated fully with the government's investigation and complied with his pretrial release conditions.

On October 11, 2025, the government executed a search warrant on Dr. Tellis' home, carrying out a raid on the entirety of his home, his person, and his vehicle. *See* FBI App. for Warrant (attached as Ex. 1). Dr. Tellis was arrested and detained during the search. The government's inventory of items seized on October 11 was extensive, including four hard drives, five thumb drives, a laptop, "3 black trash bags with pages containing classified markings," and the "contents" of a "four drawer filing cabinet" and a "two drawer filing cabinet" containing pages with classified markings. *See* FBI Receipt of Property (attached as Ex. 2).

On October 13, the government submitted a criminal complaint charging Dr. Tellis with a violation of 18 U.S.C. § 793(e) for "[u]nlawful retention of national defense information." ECF No. 1. In support of the complaint, the Federal Bureau of Investigation (FBI) submitted an affidavit. ECF No. 2, alleging that a search of Dr. Tellis' residence yielded "over a thousand pages

of paper documents with classification markings at the TOP SECRET and/or SECRET levels." *Id.* ¶ 27.

On October 14, Dr. Tellis made his initial appearance before the Court. ECF No. 5. The government requested detention, and a hearing on detention was continued until October 21. Immediately following the initial appearance, counsel for Dr. Tellis conferred with government attorneys and conveyed his intent to cooperate in full. In the following days, the parties conferred and agreed that the government would not seek detention. They also requested that the parties jointly move to extend the time to indict by 30 days and agreed that Dr. Tellis would meet with the government to speak regarding the charge under an informal-direct use immunity agreement.

On October 20, Dr. Tellis filed a brief in support of pretrial release, setting forth the ample reasons the Court should accept the release of Dr. Tellis. ECF No. 14. On October 21, the Court held a detention hearing, during which the government notified the Court that it would not seek detention and that the parties had agreed to certain pretrial conditions, including: home detention with electronic monitoring, release to his wife as a third-party custodian, refraining from possessing or accessing a computer or internet unless a computer monitoring program has been installed by Pretrial Services, and a bond secured by Dr. Tellis' home, cosigned by his wife. The Court questioned both defense counsel and the government about the need for GPS monitoring. Defense counsel noted that it would honor the agreement the parties had reached regarding detention, though believes strongly no such monitoring is needed to ensure future appearances. Ultimately, the Court entered the order for release of Dr. Tellis with conditions. ECF No. 22. The Court ordered Dr. Tellis be released that same day, to return the following day, October 22, to meet with probation officers and have the GPS system installed. The Court expressed no qualms

permitting Dr. Tellis to spend the first night at his home without electronic monitoring. Dr. Tellis reported to probation the next morning as ordered.

Since October 22, Dr. Tellis has remained under GPS electronic monitoring and has complied with all conditions of release.[1] The government does not allege otherwise.

On October 28, Dr. Tellis—at his residence while under home detention—discovered two hard drives (one black and one silver) and a paper bag containing documents that the FBI had not seized during their October 11 search. Dr. Tellis contacted his counsel, and counsel notified the government. The following morning, coordinating with defense counsel, FBI agents returned to Dr. Tellis' residence to collect these items. Dr. Tellis also identified, while the government was at his home on October 29, a third hard drive that contained family movies. The government accepted his truthful accounting of this hard drive and declined to seize it. The silver hard drive that Dr. Tellis discovered and voluntarily provided to the government is the same hard drive referenced multiple times in the government's motion. *See* Motion to Reopen Detention ("Mot.") at 8, 12, 13, ECF No. 33.

On November 4, consistent with Dr. Tellis' immediate cooperation with the government, Dr. Tellis also met with government attorneys and officials, speaking with them for several hours and answering their questions. Dr. Tellis has continued to offer to answer additional questions or provide further information. Thus far, the government has not sought any additional information

---

[1] On November 14—two days before the government filed its motion to reopen detention—the lead probation officer working with Dr. Tellis, Officer Vakida Wilson, via email, confirmed to the government that Dr. Tellis is complying with the conditions of his release. *See* Email from Vakida Wilson to Leslie Esbrook (Nov. 14, 2025) (attached as Ex. 3). As recently as December 2, defense counsel conferred with Officer Wilson, and Officer Wilson confirmed that Dr. Tellis has continued to have zero violations.

from Dr. Tellis.  There is no suggestion on the part of the government that Dr. Tellis has been anything less than fully truthful.

On November 9, 2025, the FBI conducted a Court-authorized search of Dr. Tellis' office and belongings at Carnegie Endowment for International Peace (CEIP).  Mot. at 8.  The FBI seized a spreadsheet from Dr. Tellis' office which the government has said "may" contain classified information and two packages from the Chinese embassy containing gifts of food, one of which the government was aware of prior to the October 21 hearing.  *Id.*

On November 13, government counsel notified the defense that they would be filing an indictment immediately—despite the agreed-upon extension—and would be moving to reopen the detention hearing and revoke the release of Dr. Tellis.

## IV.  REOPENING THE DETENTION HEARING IS NOT JUSTIFIED

### A.  Legal Standard

A detention hearing may be reopened after a court determines that "information exists that" (1) "was not known to the movant at the time of the hearing" and (2) "has a *material* bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f) (emphasis added).  "Courts interpret this provision strictly."  *United States v. Knight*, 452 F. Supp. 3d 938, 945 (D. Nev. 2020) (collecting cases).

*First*, the information must be previously unknown.  Courts across the country interpret "'not known to the movant at the time of the hearing' language to mean not just actual knowledge, but also constructive knowledge, i.e., knowledge that one using reasonable care or diligence should have."  *United States v. Munguia*, No. 3:19-CR-191-B (03), 2020 WL 1471741, at *3 (N.D. Tex. Mar. 26, 2020) (quoting *United States v. Spring*, Crim. A. No. 14-10303-RGS, 2014 WL 6609156, at *2 (D. Mass. Nov. 20, 2014)).  "[C]onclusory allegations that information is newly discovered

do not suffice; a party seeking to reopen detention must show how the evidence was discovered and why it was previously unavailable." *United States v. Morris*, 452 F. Supp. 3d 484, 487 (N.D. Tex. 2020).

*Second*, the information must be "material" to detention. "[M]aterial bearing . . . refer[s] to information that actually affects the Court's decision whether to detain the defendant pending trial." *United States v. Krol*, 642 F. Supp. 3d 28, 35 (D.D.C. 2022) (quotation omitted). "Thus, in addition to 'bearing' on—having a logical relation to—detention, the sort of new information capable of reopening a detention hearing must also 'bear' *materially*—it must relate in some *significant* or *essential* way to the decision whether to detain." *United States v. Worrell*, No. 21-cr-292, 2021 WL 2366934 at *9 (D.D.C. June 9, 2021) (emphasis in original). In other words, "[n]ew and material information . . . must consist of truly changed circumstances, something unexpected, or a significant event," *United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020), that weigh on the Court's analysis of whether Dr. Tellis is a flight risk or poses a danger to his community. Evidence that is cumulative of previously available evidence will not tip the scales. *See United States v. Oury*, 452 F. Supp. 3d 1364, 1369, 1371 (S.D. Ga. 2020) (denying motion to reopen under Section 3142(f) in part because evidence presented was "largely cumulative of evidence previously considered").

### B. Argument

The government's motion sets forth information it "now knows," Mot. at 1–2, but little qualifies as new under the governing standard described above. Instead, the motion largely repackages facts that were already known—or readily knowable with reasonable diligence—before the October 21, 2025 detention hearing. And *none* of this information is both new *and* material to detention, as required to reopen a detention hearing.

Regarding the materiality requirement, it appears that most, if not all, of the information the government claims is new is related to the argument that Dr. Tellis is a danger to the community. As explained *infra* in Section V(B)(1), dangerousness cannot be a basis for detention here because Dr. Tellis is not charged with one of the crimes on the limited and exclusive list contained in Section 3142(f)(1) of the Bail Reform Act. Therefore, the information identified by the government should be judged for its materiality to flight risk only. Nonetheless, to preserve all arguments, we will address both dangerousness and flight.

The government has provided eight points of information that it alleges satisfy its burden of showing that its instant motion is based on information that is both new and material. We address each in turn.

1.  Volume of documents seized on October 11.

In its efforts to meet its burden of demonstrating that its information is new, the government first argues that reopening detention is warranted because the government did not finish counting and cataloging the documents the FBI seized from Dr. Tellis' home until October 30, some nine days after the hearing. Mot. at 1–2, 11. The volume and classification of the documents seized from Dr. Tellis' residence—10 days before the hearing—is not new information. Just two days after the search, on October 13, the government stated in an affidavit that it had "located over a thousand pages of paper documents with classification markings at the TOP SECRET and/or SECRET levels" Decl. of Jeffrey Scott ¶ 27 ("Scott Decl."), ECF No. 2. The government was well aware of the volume of documents it had physically removed from Dr. Tellis' home and that many allegedly were classified. With that information in mind, the government agreed to no detention on October 21.

Indeed, a refined page count is in no way a "truly changed circumstance[]," nor is it "something unexpected." *Lee*, 451 F. Supp. 3d at 5. The government does not explain how an

exact page count has any bearing, let alone a material one, on whether Dr. Tellis is a flight risk or danger. It is at most a fact that is cumulative of information available to the government well before the October 21 detention hearing. Cumulative facts are not new material facts for purposes of reopening these proceedings. *See Oury*, 452 F. Supp. 3d at 1371.

As a final note, the government's 19-day delay between tallying the documents, which it did by October 30, Mot. at 11, and moving to reopen detention underscores that—beyond the fact that this information is not "new"—the information did not actually create a material concern for the safety of the community or risk of flight.

        2.      <u>Receipt of classified information "from other classified information holders not in his government offices."</u>

The government also makes the above public statement, referencing information in a sealed document submitted as Exhibit 2 to the motion. In a sealed response to the issues raised, attached as Ex. 4, the defense demonstrates that the insinuations here are misleading, the information is not new or material, and Exhibit 2 provides no basis to reopen the hearing.

        3.      <u>Received classified documents from other clearance-holders in other government offices.</u>

The government also makes the above public statement, referencing information in a sealed document submitted as Exhibit 2 to the motion. On this public statement alone, it is clear that the persons with whom Dr. Tellis communicated *held valid security clearances*. Moreover, danger and risk of flight are *forward-looking* questions, *i.e.*, does Dr. Tellis pose a *future* danger to the community? Dr. Tellis' documents have been removed from his home, his clearance is suspended, he is not employed, and he no longer has access to the classified email system on

which these communications occurred.  The communications identified in Exhibit 2 therefore have no material bearing on the question of detention.

In a sealed response, attached as Ex. 4, addressing the remaining details that have been sealed by the government, the defense demonstrates that the information is not new or material to detention and Exhibit 2 provides no basis to reopen the hearing.

### 4. The subject matter of documents seized on October 11.

The government also argues that it took until October 30 not only to count the documents but also to "understand the amount of information seized as it relates to the PRC, and to the particularly sensitive topic of nuclear capabilities." Mot. at 11–12.  First, this information should not be considered new or "not known."  The government had the documents for 10 days prior to the detention hearing.  Even a cursory review would have revealed the information the government now claims is novel—that Dr. Tellis had "a large amount of classified documents related to the PRC."  Mot. at 2.  Indeed, the government has focused on connections to China since the genesis of this case.  *See, e.g.*, Scott Decl. ¶¶ 21–25.  It would be reasonable to expect the government to have immediately assessed the China-related documents.

The government's own Exhibit 3 to its motion dated October 16—*five days before the detention hearing*—shows that the government was well aware of the content and perceived sensitivity of the documents seized.  The memorandum by Andrew May stated that Dr. Tellis' alleged document retention "concerned highly sensitive, highly-classified intelligence information."  Statement of Andrew May, Off. of Net Assessment (Oct. 16, 2025), ECF No. 33-3 at 2.  The government's ability to make this assessment five days prior to the detention hearing means that it also knew, or reasonably could have known, the subject matter of documents that it now claims to be newly discovered.

Even if this information were new, it is not material. Courts look for "changed circumstances, something unexpected, or … significant" relating to detention. *Lee*, 451 F. Supp. 3d at 5. Dr. Tellis having interest in China, including its military and nuclear capabilities, would be expected by anyone with a basic familiarity with Dr. Tellis' expertise and scholarship. Much of Dr. Tellis' career—both in and out of government—has focused on China and on nuclear strategy. Dr. Tellis has testified twice before Congress about China,[2] and has published numerous scholarly works on China. *See* Ashley J. Tellis Curriculum Vitae, ECF No. 14-2. For decades, Dr. Tellis' professional life centered on nuclear issues (*e.g.*, the U.S.–India civil nuclear agreement), and he has written extensively on nuclear strategy and capabilities in both academic and policy venues. *See id.* That documents the FBI seized relate to China and nuclear matters is consistent with Dr. Tellis' areas of expertise, of which the government was aware well before the October 21 detention hearing.

As a final point, we must again point out that while the detention analysis is forward-looking, the government has highlighted the subject of documents to which Dr. Tellis no longer has any access. This information is therefore immaterial.

     5.    <u>Token gifts from foreign officials.</u>

The government misleadingly states that it was not previously aware that Dr. Tellis had "received token gifts from the PRC as recently as October 2025" and argues that its seizure of two packages of food from Dr. Tellis' Carnegie office is new and material. Mot. at 1–2. But Dr. Tellis' alleged receipt of token gifts from Chinese officials was clearly stated in the government's affidavit

---

[2] Ashley J. Tellis, Carnegie Endowment for International Peace, Protecting America Primacy in the Indo-Pacific, Testimony Before the Senate Armed Services Committee 17 (Apr. 25, 2017); Ashley J. Tellis, Carnegie Endowment for International Peace, China's Space Capabilities and their Impact on U.S. National Security, Testimony Before the U.S.-China Economic and Security Review Commission 10-11 (May 20, 2008).

in support of the complaint.  Scott Decl. ¶ 25 ("[T]he PRC officials gave [Dr. Tellis] a red gift bag.").  And the government's motion admits, in a footnote, that it "had been informed prior to October 21, 2025, that a postal box addressed to the defendant from the PRC Embassy was held at [Dr. Tellis' Carnegie office]." Mot. 8 n.7.  Moreover, defense's memorandum submitted the day before the detention hearing took on squarely the issue of token gifts—not denying they occurred but explaining that they are both commonplace and entirely benign for someone in Dr. Tellis' position.  ECF No. 14 at 6, 11; Schake Decl. ¶¶ 10, 11.  That pre-hearing memorandum also highlighted that when the FBI searched the Tellis home, Mrs. Tellis showed the FBI a red gift bag *containing only tea* that Dr. Tellis had received from PRC officials in September, which FBI agents then declined to seize as evidence.  ECF No. 14 at 5.  Defense even submitted pictures of the red gift bag with tea visible inside in their memorandum in support of release. ECF No. 14-3.

That the government seized gifts—*both of food alone* and one of which the Government had prior knowledge of—is certainly not material.  While many Western embassies send treats around Christmas, the Chinese embassy regularly sends mooncakes and other treats in the fall, honoring the traditional harvest festival celebrated by Chinese people.  The government fails to explain how receiving a token gift—whether it be food or tea—from PRC officials makes Dr. Tellis a flight risk or danger to the community.  It plainly does not.  *See* Schake Decl. ¶ 11 ("These gestures are symbolic and customary; they do not, in themselves, indicate undue influence, bribery, or illicit conduct . . . .").

### 6.    Electronic/digital classified information.

The government also points to "electronic" or "digital" classified information contained on a hard drive Dr. Tellis himself turned over to the government.  While the government acquired the hard drive after the October 21 detention hearing, it is important to emphasize how and why.  As noted above, Dr. Tellis himself discovered the hard drive in his home—apparently overlooked by

FBI agents—and immediately and voluntarily provided it to the government. *See* Section III, *supra*. That is not the decision-making of a person intent on fleeing or causing harm to his country—it is quite the opposite.

Further, the digitized documents on the hard drive are not new either, in the sense that there is no "truly changed circumstance[]" to speak of. *Lee*, 451 F. Supp. 3d at 5. The alleged presence of digital classified documents is part and parcel to the same charged offense of removing and retaining such documents without authorization. And the search inventory, attached as Ex. 4, already shows that agents seized multiple hard drives from Dr. Tellis' home office on October 11, which they presumably expected to contain classified information. The existence of one more drive—voluntarily provided by Dr. Tellis—cannot have materially changed the question of detention since the government agreed to release Dr. Tellis on October 21. Again, this evidence is at most cumulative, and not sufficient to tip the scales. *See Oury*, 452 F. Supp. 3d at 1371.

7.  <u>Possibly "mixed" classified information.</u>

The spreadsheet the FBI seized from Dr. Tellis' Carnegie office fares no better. As an initial matter, this single document, which the government still cannot allege as definitively containing classified, information, *see* Mot. at 8 ("An initial review indicates that the document *may* contain classified information." (emphasis added)), is nothing unexpected. The spreadsheet was a routine part of Dr. Tellis' work for Carnegie and represents years of work consolidating data exclusively from public sources including public websites. Dr. Tellis would then adjust and modify the data points to create simulations. The work was going to be the analytical basis for an upcoming publication. If necessary, we will demonstrate to the Court at a closed hearing how this document derived from non-classified sources, as well as rebut certain statement about the spreadsheet in classified Exhibit 1 (which defense is not currently able to show Dr. Tellis). Dr. Tellis has offered to explain his spreadsheet and public sourcing to the government.

The spreadsheet is also immaterial to the charges in the indictment, which alleges unlawful retention of two specific documents—neither of which is the spreadsheet—and the government cannot even confirm whether the spreadsheet contained non-public classified information.

> 8.    Interaction with a cleared government employee who once securely emailed him a classified document.

This point again relates to the government's sealed Exhibit 2, *see supra* II(B)(2). As further detailed in defense's sealed response, Ex. 4, the insinuation here is misleading, and Dr. Tellis' continued communication with the identified individual does not create any danger to the community but rather shows a connection that cuts cleanly against detention.

## V.    DETENTION OF DR. TELLIS REMAINS UNWARRANTED

The government's failure to come forth with any truly new, material information means that the government has failed to meet the statutory burden that it must meet before the bail determination can be reopened. But even if reopening the detention hearing were appropriate, the government's evidence continues to fall well short of its burden to justify detaining Dr. Tellis pending trial. First, the government emphasizes danger to the community as its primary argument, yet the charged offense is not among those enumerated in Section 3142(f)(1) and therefore cannot serve as the basis to detain Dr. Tellis on grounds of dangerousness. Regardless, the government cannot meet its evidentiary burdens. To support its primary claim—that Dr. Tellis is a danger to the community, *see* Mot. at 12-16—the government must prove by "clear and convincing evidence" that "no conditions other than detention will reasonably assure the safety of any other person and the community." *United States v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (emphasis added). To support its secondary claim—that Dr. Tellis is a flight risk, *see* Mot. at 16-18—the government must prove by a preponderance of the evidence that detention is necessary to "reasonably assure" the appearance of the defendant at future court proceedings. *United States v.*

*Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). The government's speculative arguments about what Dr. Tellis "might" or "could" do cannot carry its burden on either front. This is particularly true in light of Dr. Tellis' perfect compliance with the Court's conditions while released for the past six weeks and his strong ties to his home, family, and community.

Finally, harm to the defense would be significant if Dr. Tellis is detained: utilizing his expert view of documents, necessary to the defense, will be extremely difficult if incarcerated.

### A. Legal Standard

Under the Bail Reform Act, a defendant shall be detained only if a judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Court's decision is guided by the factors set forth in 18 U.S.C. § 3142(g). These factors are (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person," including, among other factors, family ties, employment, financial resources, past conduct, and criminal history; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.*; *see also United States v. Vane*, 117 F.4th 244, 250 (4th Cir. 2024).

The Bail Reform Act requires the judicial officer to impose the "least restrictive" means of reasonably assuring the appearance of the person and safety of the community. 18 U.S.C. § 3142(c)(1)(B). Only in "rare circumstances should release be denied," and any "doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). "The default position of the law, therefore, is that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

## B.      Argument

Dr. Tellis has demonstrated to the Court while on release *for the last six weeks* that he is neither a danger to the community nor a risk of flight, exhibiting perfect compliance with the law and pretrial release conditions imposed by this Court. The government cannot meet its burden under the preponderance standard, let alone the clear and convincing standard. Dr. Tellis should remain released pending trial under the same, continuing conditions.

The government's arguments and hypotheticals to the contrary are baseless and speculative and fall well short of the standards to detain Dr. Tellis. In contrast to dissemination cases, pretrial detention in "retention" prosecutions under 18 U.S.C. § 793(e) is extremely uncommon, particularly where there is no evidence of dissemination, no obstruction, and the defendant has deep community and professional ties. Among prominent recent cases alleging retention of national defense information or classified information, such as those of Donald Trump and David Petraeus, defendants have faced no detention pending their trials. In this district, in *United States v. Daniel Hale*, No. 1:19-cr-00059 (E.D. Va. May 17, 2019), ECF No. 19, the defendant, who was charged with retention and later transmission of national defense information, remained free pretrial prior to entering a plea. And in *United States v. Harold T. Martin III*, No. 1:16-mj-02254 (D. Md. Oct. 21, 2016), ECF No. 24, a rare instance of pretrial detention, the court's decision rested on concerns of obstruction and concealment—combined with his alcohol abuse, threats of suicide, and possession of several firearms (which he kept secret from his wife)—not mere possession or retention of national defense information.

Even in transmission cases, defendants are often granted bail. Just days before Dr. Tellis' detention hearing, John Bolton, who had been charged by indictment with ten counts of unauthorized retention of national defense information and eight counts of unauthorized *transmission* of national defense information, *Bolton*, No. 8:25-cr-314-TDC-1, ECF No. 1, was

released on personal recognizance, with limited conditions—no home confinement, electronic monitoring, prohibition on work, prohibition on internet access, or strict geographical limitations, *id.*, ECF No. 9. Counsel for Dr. Tellis previously represented defendants Rosen and Weissman in *United States v. Franklin et al.*, No. 1:05-cr-00225-TSE (E.D. Va. 2005), in which defendants charged with both retention and transmission of national defense information were released on unsecured bonds.[3]

These cases make clear that pretrial detention in Espionage Act retention prosecution is confined to truly exceptional situations—those involving aggravating conduct such as deception or efforts to obstruct the investigation. Counsel is not aware of any case in which an academic, policy expert, or similarly situated professional, with no allegation of transmission or obstructive behavior, and with longstanding family and community ties, was detained pretrial solely on the basis of retention allegations.

The same outcome was the correct outcome here—further evidenced by Dr. Tellis' perfect compliance for six weeks while released. And that outcome should hold, regardless of the government's shifting position.

        1.    <u>The Bail Reform Act Does Not Authorize Detention Based on Danger for the Charged Offense.</u>

While the Fourth Circuit has not yet opined on the issue, numerous courts of appeals have interpreted the statutory language in the Bail Reform Act to provide that Section 3142(f)(1) sets forth the *exclusive* grounds that authorize detention based on dangerousness. *See, e.g.*, *United*

---

[3] *See also United States v. Frese*, No. 1:19-cr-00304 (E.D. Va. Oct. 8, 2019) (releasing on bond, to the defendant's sister with GPS monitoring, a defendant charged with more than 10 instances of willful transmission of TOP SECRET national defense information); *United States v. Kiriakou*, No. 1:12-cr-00127 (E.D. Va. Apr. 5, 2012) (releasing on bond, with the government's agreement, a former CIA operative who was charged with (1) disclosing the identity of a covert agent; (2) disclosing TOP SECRET/SCI national defense information; and (3) conducting "trick" and "scheme" to conceal a material fact from the CIA).

*States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988) ("[W]here detention is based on dangerousness grounds, it can be ordered only in cases involving one of the circumstances set forth in § 3142(f)(1)."); *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) (concluding that the statute does not authorize "pretrial detention upon proof of danger to the community other than from those offenses which will support a motion for detention"); *see also United States v. Presley*, 52 F.3d 64, 70 (4th Cir. 1995) (citing *Ploof* favorably).  And courts within this Circuit have followed that approach.  *See United States v. DeBeir*, 16 F. Supp. 2d 592, 594 (D. Md. 1998) ("[T]his Court agrees with at least two circuits that . . . interpret the [Bail Reform] Act to authorize detention based on dangerousness grounds only in cases involving one of the four circumstances set forth in § 3142(f)(1), which includes crimes of violence as well as other serious crimes."); *but see United States v. Bilbrough*, 452 F. Supp. 3d 264, 266 (D. Md. 2020) (holding that Section 3142(f)(1) conditions were not prerequisite for detaining based on danger).  These decisions are consistent with the gatekeeping function of Section 3142(f), which "was unquestionably written for the benefit of defendant-arrestees."  *Hosh v. Lucero*, 680 F.3d 375, 382 (4th Cir. 2012); *see also id.* ("Part of the Bail Reform Act, § 3142(f) required the Government to meet a statutory burden before pretrial detention would be allowed.").

The factors in Section 3142(f)(1) include a limited number of especially serious charges, such as certain "crimes of violence" or "offense[s] for which the maximum sentence is life imprisonment or death."  18 U.S.C. § 3142(f)(1).  Dr. Tellis' charge does not fall within this category, a point the Government does not dispute.

2.    Regardless, Dr. Tellis presents no future danger.

To obtain a detention order based on danger to the community, the government must prove their position not by a mere preponderance, but by "clear and convincing evidence."  *Simms*, 128 F. App'x at 315.  Significantly, the Bail Reform Act considers only "*future* dangerousness."

*United States v. Salerno*, 481 U.S. 739, 751 (1987) (emphasis added). "The crux of the constitutional justification for preventive detention under the Bail Reform Act is that '[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, . . . a court may disable the arrestee from executing that threat.'" *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) (quoting *Salerno*, 481 U.S. at 751). "Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, *prospective* threat to public safety" that cannot be addressed through conditions of release. *Id.* (emphasis added).

Here, the government has failed to identify any "concrete, prospective threat" to public safety posed by releasing Dr. Tellis. The sole charge against him is the unlawful *retention* of national defense information—not its dissemination. The government first points to the volume of classified material they allegedly found. But all of the previously retained documents at issue were seized by the government—including some that Dr. Tellis voluntarily provided to the government. Indeed, it is surprising that the government would speculate that Dr. Tellis "may have additional copies of classified materials not seized by the government," Mot. at 13, when it was Dr. Tellis who discovered and voluntarily provided relevant materials that the government's search overlooked, *see* Section III, *supra*. And Dr. Tellis will not be accessing any additional classified documents—he is not working, is not using the internet pursuant to his conditions of release, and his security clearance has been suspended.

The government's suggestions that Dr. Tellis might transmit classified information is baseless. Again, Dr. Tellis is *not* charged with dissemination of national defense information.

There is no allegation, let alone evidence, that Dr. Tellis ever shared, attempted to share, or intended to share national defense information with unauthorized individuals. While the government's affidavit in support of the complaint contained reckless and false insinuations that Dr. Tellis may have had an inappropriate relationship with Chinese officials with whom he had dinner, those insinuations were addressed head-on in the defense's first memorandum in support of pretrial release, *see* ECF No. 14 at 10–11, and were conspicuously—and correctly—absent in the government's subsequent indictment, ECF No. 26.[4]

It is therefore disappointing that the government has resurrected these old insinuations in its motion to reopen the detention hearing, still without evidence in support, purportedly to show danger to the community. The government's motion again cites a fleeting reference in the affidavit supporting the complaint to a "manila envelope" that Dr. Tellis was observed carrying on one occasion in 2022. Mot. at 6. In the affidavit, the government offered no evidence as to the envelope's contents and conceded that he merely "did not appear to have [it]" at the end of the meeting. *See* Scott Decl. ¶ 22. In fact, the most plausible explanation is entirely benign: during that period, Dr. Tellis was routinely distributing hard copies of, and carrying on discussions about, his 2022 Carnegie Endowment publication, *Striking Asymmetries: Nuclear Transitions in Southern Asia*, sharing them with colleagues and counterparts.

---

[4] The government's motion cites *United States v. Gun*, No. 1:24-cr-00199-MSN, ECF No. 30 (Sept. 10, 2024) in which the defendant, charged with unlawfully removing classified documents in violation of 18 U.S.C. § 1924, was ordered by this Court to be detained pending trial. Mot. at 15. The facts of *Gun*, however, were different, including that the defendant was arrested just before leaving the country with a Top Secret document and his security clearance credentials in his backpack. The Court dedicated much of its analysis to this evidence, which it found credible, finding that the defendant was either prepared to leave the country with the Top Secret document or to abandon it outside his home for five days. *Id.* at 40–41.

The government muses that the information Dr. Tellis has *in his brain* would be harmful if provided to "geopolitical adversaries such as the PRC" and it "would not be difficult" for him to share that information. Mot. at 13. But Dr. Tellis has never transmitted national defense information to anyone unauthorized, nor has the government charged him with doing so. The government's speculation, if accepted, would support locking up anyone with a high-level security clearance under a baseless fear that they *could* share their knowledge with a geopolitical foe.

The government also asserts that many of the documents seized by the government "relate to China" and refer to this as a "significant, unexpected revelation." ECF No. 33 at 15. There would be nothing significant or unexpected about Dr. Tellis having interest in China. Any biography of Dr. Tellis, as well as his *curriculum vitae* that the defense provided as Exhibit B to the October 20 memorandum in support of pretrial release, ECF No. 14-2, demonstrates that he is an expert and scholar on Asian foreign relations, and in particular on the military and foreign affairs of India, Pakistan, *and China*. *See also* Section IV(B)(4), *supra* (discussing Dr. Tellis' professional expertise on China).

The government's argument reaches multiple levels of speculation when it invokes a spreadsheet purportedly found during the search of Dr. Tellis' office at Carnegie. First, the government is unable to say with certainty whether this document contained classified information. Mot. at 14–15. "May" include classified information does not constitute proof by clear and convincing evidence. Then, the government again speculates that such a document "could be particularly valuable to a foreign adversary." *Id.* at 15. Moreover, the government seized the spreadsheet. As we have pointed out throughout this opposition, Dr. Tellis no longer has access to any of the documents he allegedly retained. Therefore, there is no *future* danger that he will use or disclose the spreadsheet or any other seized document.

The government also cites Dr. Tellis alleged "storage of extremely sensitive materials in settings that were open" as a basis for his dangerousness. Mot. at 14. Regardless of the government's exaggeration on this issue (Dr. Tellis provided keys to the FBI agents to unlock filing cabinets with documents), how Dr. Tellis may have stored documents that have now all been seized and removed from his home is not persuasive as to the *future* dangerousness that the government must show.

The government also speculates that "[i]t would be easy for" Dr. Tellis to "conceal his behavior while on home detention to provide information to a foreign adversary or to PRC officials." Mot. at 16. Again, the government has not alleged that Dr. Tellis has unlawfully disseminated any information, nor do they present any evidence that would support such an idea. To the contrary, when Dr. Tellis discovered a hard drive and documents in his home that FBI agents apparently overlooked during their search, he immediately and voluntarily provided it to the government. That is not the behavior of someone who intends to conceal or act in a clandestine fashion going forward—Dr. Tellis intends to cooperate with the government's investigation and abide by the Court's conditions of pretrial release.

The defense does not intend to downplay the seriousness of the charges against Dr. Tellis. In fact, the conditions of release on which the parties agreed are strict, in recognition that the government had concerns to be addressed. As the Court is aware, the conditions include home confinement under electronic surveillance, no passport or travel outside the D.C. area, and no access to any devices connected to the internet, among others. *See* ECF No. 22. Dr. Tellis has taken these conditions seriously and complied meticulously with each.

3.    <u>Dr. Tellis Will Appear as Ordered by the Court.</u>

Dr. Tellis is not a flight risk. The Court need look no further than the past six weeks of release. Dr. Tellis has not fled but rather complied perfectly with the Court's conditions. The

government's argument that he is nonetheless a flight risk because he "has not yet fully faced the potential he will be sent to federal prison," Mot. at 17, is both speculative and simply incorrect. Dr. Tellis has an experienced legal team, who have counseled him throughout regarding the potential outcomes of this case. And the government fails to acknowledge the truly broad range of outcomes for a document *retention* case such as this. Aside from the many similar cases never even prosecuted (Joseph R. Biden, Hillary Clinton, Alberto Gonzalez), convictions for retention only under Section 793(e) have resulted in sentences of 12 months or less, *see United States v. Saucier*, No. 3:15-cr-131 (D. Conn. 2016) (sentenced to 12 months' imprisonment), or have been charged under Section 793(e) only to be pled under 18 U.S.C. § 1924 with a lesser sentence, *see United States v. Hitselberger* (sentenced to approximately two months' time served). As noted below, *see infra* Section V(B)(4), the strength of the government's evidence is likely not as strong as it suggests. Regardless, Dr. Tellis is aware of the stakes in his prosecution and has no intent to flee. He did not immediately engage counsel to help him run but to help him defend.

Indeed, the government's argument that Dr. Tellis is a flight risk amounts to a string of hypotheticals. The government imagines, for example, that "he could easily cut his ankle monitor and drive any of the dozens of embassies nearby." Mot. at 16. There is no evidence to support these speculations.[5]

---

[5] The government cites *United States v. Mallory*, 268 F.Supp.3d 854 (E.D. Va. July 7, 2017), as a case supporting their flight risk argument. But the circumstances of *Mallory* could not be more different. In that case, the defendant was charged under Section 794 of the Espionage Act, which carries a sentence up to life in prison, for transmitting national defense information directly to Chinese intelligence operatives, of which the Court concluded there was "ample evidence." *Id.* at 863. Among other extreme facts, the Court found that the defendant was a "trained and seasoned intelligence operative with skills and tradecraft that would help him flee and evade capture," and the FBI had found wigs, make-up, and other tools of disguise at the defendant's home. *Id.* at 864.

There is, on the other hand, plenty of evidence—even beyond his compliance on release for a month and a half—that Dr. Tellis will not flee and will appear as ordered by the Court. Dr. Tellis is part of a close-knit family—all local to the DMV area. Their family home secures Dr. Tellis' bond. He has no intention to abandon his family and leave them without a home. Dr. Tellis is a leading scholar in international security and U.S. foreign policy with a focus on Asia, particularly India, Pakistan, and China. He has spent decades serving his country and contributing to policymaking at the highest levels of the U.S. government and is proud of the career in public service. Dr. Tellis is committed to restoring his reputation as a distinguished scholar and advisor, beginning with his immediate and complete cooperation with the government investigators.

Furthermore, Dr. Tellis' medical concerns have continued. For privacy reasons, we will be happy to provide the Court and government *in camera* copies of the records reflecting Dr. Tellis' recent medical appointments and CT coronary angiogram. These conditions underscore the need for Dr. Tellis to remain under the care of his established medical providers. His ongoing health concerns and upcoming appointments with medical specialists further show that he is not a flight risk. Instead, Dr. Tellis needs to be at home with his family and with ready access to his lawyers and physicians.

Finally, Dr. Tellis has shown and will continue to show that he will appear as ordered by the Court. He was initially released without electronic monitoring and he appeared at Probation and Pretrial Services the next day to begin the set up. He offered to meeting with the government at the U.S. Attorney's Office on November 4 and he did so. By the time this motion is decided, the Court will see him appear for his arraignment on December 8. And throughout his time on release, Dr. Tellis has visited in-person with his counsel regularly to discuss the case. He does not intend to flee and will continue to appear as ordered.

### 4. The Weight of the Evidence Against Dr. Tellis is Not as Strong as Suggested.

The government suggests in their motion that the weight of evidence against Dr. Tellis is a factor in favor of detention. Mot. at 1. Dr. Tellis was charged with the unlawful retention of national defense information of two specific documents. ECF No. 26.

Dr. Tellis is not charged under a statute criminalizing the retention of "classified" information. Indeed, that word does not appear in the World War I era statute. Rather, he is charged under a statute that criminalizes the retention of national defense information. Under the statute, "national defense information" means information that is "reasonably be connected with the defense of the United States" that is (1) "closely held" by the United States government and (2) if disclosed, "would be potentially damaging to the United States or might be useful to an enemy of the United States." *United States v. Morison*, 844 F.2d 1057, 1076 (4th Cir. 1988). Information that is publicly available is not closely held. *Id.* Most classified information does *not* amount to national defense information.[6] The government will have to prove that the information at issue was not only classified but also national defense information. But in addressing the supposed weight of the evidence, the government's motion makes no mention of these two critical factors—"closely held" and "potentially damaging"—as to the charged documents.

The government charged him with unauthorized retention of only two documents, DOCUMENT A and DOCUMENT B. In just the past three days, defense counsel and Dr. Tellis have been permitted to view DOCUMENT A and DOCUMENT B. While the review will be

---

[6] *See United States v. Rosen*, 445 F. Supp. 2d 602, 623 (E.D. Va. 2006), *aff'd*, 557 F.3d 192 (4th Cir. 2009) ("[E]vidence that the information was classified is neither strictly necessary nor always sufficient to obtain a prosecution under § 793"); *see also Modernizing the Government's Classification System:* Hearing Before the S. Comm. on Homeland Sec. & Governmental Affs., 118th Cong. 70 (2023) (statement of Thomas Blanton, Dir., Nat'l Sec. Archive) ("Over-classification is out of control.").

ongoing, the defense has already identified classified portions of these documents that it believes are not closely held or otherwise do not meet the criteria for national defense information. To the extent the Court considers the weight of the evidence to favor detention here, the defense would appreciate the opportunity to address the appropriate weight as to the two charged documents with the Court in a secure setting.

## CONCLUSION

For the reasons set forth above, reopening the pretrial hearing is not warranted and continued release is appropriate and necessary.

Accordingly, we respectfully ask that the Court deny the government's motion and maintain Dr. Tellis' current conditions of release.


Dated: December 5, 2025.

Respectfully submitted,


/s/ John Nassikas
John Nassikas (VA Bar No. 24077)
Baruch Weiss (admitted *pro hac vice*)
Henry Morris (VA Bar No. 93686)
Arnold & Porter LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-6820
Telephone: (202) 942-6819
Telephone: (202) 942-5290
john.nassikas@arnoldporter.com
baruch.weiss@arnoldporter.com
henry.morris@arnoldporter.com


*Attorneys for Ashley J. Tellis.*

**<u>CERTIFICATE OF SERVICE</u>**

   This is to certify that the undersigned has this day filed the foregoing document electronically with the United States District Court for the Eastern District of Virginia with electronic service to all counsel and parties of record.

Dated: December 5, 2025.

          /s/ John Nassikas_____
          John Nassikas