**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>ASHLEY J. TELLIS,<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)   Case No. 1:25-cr-00308-MSN<br>)<br>)<br>)<br>)<br>)<br>) |

**REPLY IN SUPPORT OF DEFENDANT ASHLEY J. TELLIS'
MOTION TO MODIFY CONDITIONS OF RELEASE**

The government's opposition, ECF No. 78 ("Opp."), urges this Court to adopt a legal framework that would transform a routine request to modify release conditions under 18 U.S.C. § 3142(c)(3) into a de facto re-litigation of detention under Section 3142(f)(2). That proposal is contrary to the Bail Reform Act's plain text, which grants district courts broad discretion to amend release conditions "at any time." *Id.* § 3142(c)(3). It would also subvert the Act's core command to impose the "least restrictive" conditions necessary to "reasonably assure" a defendant's appearance and the safety of the community. *Id.* § 3142(c)(1)(B). Properly applied, the Act permits Dr. Tellis to make his modest request: substituting a nightly 8:00 p.m. to 8:00 a.m. curfew for 24-hour home detention, while keeping GPS monitoring and all other conditions in place.

Even if the Court were to apply the government's preferred "new and material information" lens, reconsideration is warranted. The case's complexities involving classified-discovery and CIPA and the resulting, materially longer pretrial schedule are developments that could not have been anticipated at the outset—before defense counsel had reviewed any of the classified materials at issue in this case. And the government's suggestion that Dr. Tellis' initial agreement to home

1

detention forecloses relief misunderstands both the Act and the record: that agreement was a practical compromise to restore Dr. Tellis' liberty after being in custody and away from his family for ten days, not a concession that round-the-clock confinement remains necessary now.

Finally, the government's repeated insinuations about PRC contacts have been rebutted thoroughly.  But even crediting the government's speculation for the sake of argument, the point remains that Dr. Tellis' current conditions do not actually address what the government says it fears: nothing in the release order prohibits him from communicating with or receiving visits from foreign officials.  If the government's true concern is contact with PRC officials (however unfounded), the least restrictive—and far more effective—response is a targeted no-contact condition, not round-the-clock confinement that prevents Dr. Tellis from visiting his children's homes but would still permit him to host PRC officials at his own. Given Dr. Tellis no longer holds a position that requires him to meet with PRC officials, nor does he have any intention of doing so, Dr. Tellis is happy to agree to a modification that prohibits such contact.

## I. A Motion to Modify Release Conditions is Not a Motion to Reopen the Pretrial Detention Hearing.

The government's threshold argument asks the Court to treat a straightforward request for a modest modification as if it were a full-blown detention appeal.  That is not what the Bail Reform Act requires.  Congress expressly authorizes courts to recalibrate release conditions, providing that a district judge "*may at any time* amend the order to impose additional or different conditions of release."  18 U.S.C. § 3142(c)(3) (emphasis added).  The statute thus gives the Court ongoing discretion to amend conditions "at any time." *Id.*  Section 3142(f)(2), by contrast, addresses when reopening a detention hearing is permitted—only when the court finds previously unknown information with a material bearing on whether conditions can reasonably assure appearance and safety.  Had Congress similarly wanted to impose that restraint on the Court whenever it wished

2

to modify release conditions, it could have and would have said so.  But Congress did not.  To engraft the requirements of subsection (f)(2) onto subsection (c)(3) is contrary to the plain text of the statute and this court's longstanding historical practice.  It would also preclude, in many instances, the ability of the Court to fulfill the statutory command of imposing only the "least restrictive" conditions necessary to address the risk of flight and the danger to the community.

The government is attempting to impose on to this motion a threshold requirement that makes sense in the context of detention hearings under subsection (f), but little sense in the context of an effort to tweak a previously issued release order under subsection (c)(3).  Subsection (f) serves a distinct gatekeeping function: it limits repeated efforts to revisit pre-trial detention determinations (not conditions) by permitting reopening only when the movant can identify information that is genuinely new—*i.e.*, information that "was not known to the movant at the time of the hearing."  18 U.S.C. § 3142(f)(2).

Subsection (c)(3), by contrast, addresses a different—and far more modest—exercise of the Court's supervisory authority: adjusting the conditions of a release order that is already in place.  It does not involve the fundamentally different determination whether a defendant should be detained or released in the first instance.  Because subsection (c)(3) concerns fine-tuning the terms of continued release, there is no textual or practical basis to import subsection (f)(2)'s gatekeeping requirement and insist that a judge may recalibrate conditions only if the information "was not known to the movant at the time of the hearing."  Congress knew how to impose that limitation when it wanted to; it placed it in subsection (f)(2), not in subsection (c)(3).

Courts in this Circuit can and do regularly modify conditions of release.  In *United States v. Stinson*, for example, Judge Trenga (along with Magistrate Judge Davis) modified the conditions of release four times over the course of several months—once over the government's objection—

3

and never required that the defendant's request be supported by new and material information. Orders, *United States v. Stinson*, 1:25-cr-00209 (E.D. Va.) (ECF Nos. 31, 38, 51, 65). In that case, a defendant who was charged with threatening violence against the President of the United States requested leeway of his home detention confinement to care for his elderly parents. Def's Mot. to Modify Conditions of Release at 1-3, *Stinson*, 1:25-cr-00209 (June 25, 2025) (ECF No. 22). The basis for the request—that the defendant was the caregiver for his two elderly parents—was admittedly not new; it was proffered by the defendant at his initial detention hearing. *Id.* at 2. The Court granted the request in part, over the government's objection. Order, *Stinson*, 1:25-cr-00209 (Jul. 1, 2025) (ECF No. 31). Notably, at no point did the government argue in its opposition that the lack of new and material information prohibited the Court from modifying release conditions. *See* U.S. Objection to Def's Mot. to Modify Conditions of Release, *Stinson*, 1:25-cr-00209 (June 26, 2025) (ECF No. 23). The statute grants, and courts exercise, broad discretion to do so.

In support of its contention that a defendant's motion should be treated as if it were a de novo detention hearing subject to subsection (f)'s threshold requirements, the government relies on language in *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). But the government's quote is quite misleading. Yes, *Stewart* says that a "district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release." *Id.* at 48; Opp. at 2. But the quoted language refers to the standard of review for a district judge when reviewing a detention determination made by a magistrate judge sitting below. *Stewart*, 19 F. App'x at 48. That appellate posture says nothing about the standard to be applied under the Court's distinct, ongoing authority under Section 3142(c)(3) to adjust conditions of an order that the judge himself issued. We are not here asking the District Court to overturn the magistrate judge's order but rather on a request that the district judge amend his own order. *See* Order, ECF No. 49. The

standard applicable to modifying one's own order, where the Court knows full well what it intended to achieve with its original order is not the same as the standard applicable to modifying someone else's order, namely that of the magistrate judge.

None of the other cases the government invokes justify rewriting the statute. Instead, the out-of-district authorities the government cites reflect discretionary, jurisdiction-specific approaches (and very different factual contexts). For instance, the court in *United States v. Ebonka*, 733 F. Supp. 3d 967 (D. Nev. 2024) recognized that "[n]either the Bail Reform Act nor the Federal Rules of Criminal Procedure establish procedures or standards for modification of pretrial conditions" and that the word "may" vests courts with "'broad . . . discretionary power' in deciding a motion to modify conditions of pretrial release." *Id.* at 969 (quoting *United States v. McGill*, 604 F.2d 1252, 1255 (9th Cir. 1979)). Another case the government cited, *United States v. Esposito*, 354 F. Supp. 3d 354, 358 (S.D.N.Y. 2019), involved repeated litigation over an extraordinary (and costly) 24-hour armed-guard condition and a reconsideration request after the Court had already held multiple hearings and considered numerous different proposals. *Id.* at 356. And while the United States District Court for the District of New Jersey construes the provision to modify conditions of release "strictly," *United States v. Johnson*, 2022 WL 375319, at *2 (D.N.J. Feb. 8, 2022), the government identified no similar cases in *this* district.

Regardless, the government's position cannot be squared with the statute's plain text, which unambiguously permits a district judge to modify conditions "at any time."

## II. Even Under the Government's Preferred Framework, Dr. Tellis Has Shown New, Material Information Supporting Modification.

Even if the Court accepts the government's premise that a request to adjust release conditions must be evaluated under Section 3142(f)(2)'s "new and material information" rubric, Dr. Tellis satisfies that test. When the parties jointly proposed conditions of release in October

2025, the case's trajectory—particularly the scope and pace of classified discovery litigation—was unknown.  At the time, defense counsel had not yet reviewed any of the classified material at issue in this case and could not have predicted its complexities. Because of the complicated nature of this case, the Court set trial for over ten months from now, to give the parties time to conduct classified discovery and CIPA proceedings. That extended pretrial schedule is new information that warrants review of Dr. Tellis' current pretrial release conditions.

The government argues (at 3) that "the amount of time a defendant must comply" with conditions is not material, citing a case from the Eastern District of Tennessee, *United States v. Ross*, 2024 WL 1890087, at *4 (E.D. Tenn. Apr. 30, 2024).[1]  But courts do not speak with one voice on that point, and the Government's cited authority is not categorical. In the District of Columbia, for example, Judge Bates modified home-detention conditions in a case where the procedural posture had evolved, explaining that "although this Court is not required to find changed circumstances in order to revisit . . . [the] release order, it does find that this case's trajectory provides some cause to revisit [the defendant's] conditions." *United States v. Brock*, No. CR 21-140 (JDB), 2021 WL 3616892, at *3 (D.D.C. Aug. 16, 2021).  The point is not that delay alone compels modification in every case, but that courts recognize that the evolving timeline and posture of the prosecution can be a legitimate basis to revisit whether existing restrictions remain the least burdensome means of reasonably assuring the statutory aims.  That variation across courts makes sense because the Bail Reform Act confers *discretion* of district judges to modify release conditions "at any time."  18 U.S.C. § 3142(c)(3).

---

[1] The court in *Ross* also determined that "[e]ven if" the pretrial release period "would constitute new and material information," that "the current combination of conditions . . . remain[ed] necessary to reasonably assure [the] Defendant's appearance in Court as required and the safety of the community." 2024 WL 1890087, at *5.  As explained in Dr. Tellis' briefs, that is not the case here.

The government also disregards entirely Dr. Tellis' transparency and cooperation throughout the last several months. This is disappointing, particularly given that Dr. Tellis has spent hours meeting with government counsel and agency representatives. He also voluntarily produced materials that the FBI had left behind carelessly during the government's search. And he has met with his Probation Officer—who first recommended seeking a curfew—over seven times. These developments are significant and material. They reflect a defendant who is anchored to this jurisdiction, engaged in his defense and with his counsel, and respectful of the Court's authority. Reconsidering release conditions is thus appropriate.

### III. Dr. Tellis' Prior Agreement Was a Temporary Compromise to Secure Release, Not a Concession that Home Detention Is Necessary

The government next argues that Dr. Tellis cannot seek relief now because he previously "acknowledged that the conditions of release currently in effect are appropriate." Opp. at 1. That framing is wrong as a matter of statute and common sense. Dr. Tellis' initial agreement to home detention was a pragmatic compromise to secure his release after 10 days in custody without seeing his wife or children—not an admission that such a restriction was *necessary* to address flight risk or danger. Indeed, defense has *always* maintained that Dr. Tellis poses *no* risk of flight or danger. *See* ECF No. 14 at 2, 9, 12 ("Dr. Tellis poses no danger to the community" and "presents no risk of flight"); ECF No. 45 at 20 ("Dr. Tellis . . . is neither a danger to the community nor a risk of flight."). The Bail Reform Act does not treat an early, liberty-restoring compromise—reached under the threat of continued confinement—as a permanent judicial finding of necessity. To the contrary, Congress requires courts to impose "the least restrictive" conditions that will reasonably assure appearance and safety, and it expressly authorized courts to revisit and recalibrate those conditions as a case unfolds: "[t]he judicial officer may at any time amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(1)(B), (c)(3).

7

IV.     **Less Restrictive Conditions of Release Would Better Address the Government's Unsubstantiated Concerns.**

The central requirement of the Bail Reform Act is that the Court impose the "least restrictive" conditions that will "reasonably assure" a defendant's appearance or the safety of the community.  18 U.S.C. § 3142(c)(1)(B).  The Supreme Court has underscored that same principle: "liberty is the norm." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Against that backdrop, the government asks the Court to maintain one of the most restrictive forms of pretrial release— 24-hour home detention—based not on evidence, but on conjecture that a curfew would give Dr. Tellis "access to all of his foreign contacts," enable him to access the Internet through "public settings" or "a contact's electronic devices," and make it "much easier" for him to seek "refuge in a foreign embassy." Opp. at 6–7.  Those hypotheticals do not justify indefinite home confinement, particularly where more tailored conditions would address the government's purported concerns more directly and more effectively.

The government's rhetoric is also untethered from both the operative allegations and Dr. Tellis' conduct on release.  The government claims that releasing Dr. Tellis on a curfew would pose a "danger to the community" because he could "disclose[]" classified information "and gravely damage the national security."  Opp. at 6.  But the government has never alleged that Dr. Tellis transmitted—or attempted to transmit—national defense information to anyone.  Nor do the government's recycled insinuations about the "red gift bag" fill that evidentiary gap.

The government's persistent "red gift bag" insinuation has been debunked repeatedly and thoroughly.  The bag contained tea.  The agents saw the bag of tea during their search (when Ms. Tellis voluntarily showed it as a recent example of a customary, token gift from foreign officials) and declined to seize it, presumably because it was plainly innocuous.  ECF No. 45, at 15–16.  And the government's emphasis on Dr. Tellis' prior foreign contacts ignores the undisputed context:

8

those interactions—including with PRC officials—were lawful and expected in connection with Dr. Tellis' former work as a foreign-policy scholar and government adviser. ECF No. 14, at 11. Dr. Tellis no longer holds these roles, and thus no longer needs to meet with foreign officials. Tellingly, the government, even when superseding the indictment, has not charged Dr. Tellis with dissemination of any of the classified documents; the charges rightly remain limited to the allegation that he removed and retained classified documents.

But even on the government's own terms, home detention is an ill-fitting and overbroad response. The government fears that a "curfew would allow the Defendant access to all of his foreign contacts in the D.C. region," Opp. at 6, but home detention does not itself prohibit contact. Nothing about Dr. Tellis' current home-detention regime prevents him from receiving visitors at his residence or speaking with anyone by landline. To be clear, Dr. Tellis has had no contact with PRC officials since his release, and he has no intention of doing so. But under his current conditions, he is welcome to host them in his home. If the government's true concern is contact with PRC officials, the least restrictive—and more effective—solution is a targeted no-contact restriction, not a 24-hour confinement.

Accordingly, to address the government's concerns—however speculative and unfounded they may be—Dr. Tellis suggests that the Court adopt a narrowly tailored condition prohibiting him from contacting, communicating with, or meeting any official, employee, or agent of the People's Republic of China, including diplomatic and consular personnel. This condition is both less restrictive than all-day home detention and more directly responsive to what the government claims to fear. A targeted condition—combined with the requested nightly curfew and the existing safeguards the Court has already imposed, including GPS monitoring, geographic limits, passport surrender, third-party custodianship, a bond secured by their family home, and strict technology-

9

monitoring restrictions—adheres to the Bail Reform Act's command to use the "least restrictive" conditions necessary to reasonably assure appearance and safety.  18 U.S.C. § 3142(c)(1)(B).

## CONCLUSION

For these reasons, Defendant respectfully requests that the Court grant his motion to modify conditions of release.

Dated: March 4, 2026.                                              Respectfully submitted,

                                                                                    */s/ John Nassikas*
                                                                                    John Nassikas (No. 24077)
                                                                                    Baruch Weiss (admitted *pro hac vice*)
                                                                                    Bonnie Devany (admitted *pro hac vice*)
                                                                                    Aaron X. Sobel (admitted *pro hac vice*)
                                                                                    Arnold & Porter LLP
                                                                                    601 Massachusetts Ave. NW
                                                                                    Washington, DC 20001
                                                                                    Telephone: (202) 942-6820
                                                                                    Telephone: (202) 942-6819
                                                                                    Telephone: (202) 942-6834
                                                                                    Telephone: (202) 942-5212
                                                                                    john.nassikas@arnoldporter.com
                                                                                    baruch.weiss@arnoldporter.com
                                                                                    bonnie.devany@arnoldporter.com
                                                                                    aaron.sobel@arnoldporter.com

                                                                                    *Attorneys for Ashley J. Tellis.*

## **CERTIFICATE OF SERVICE**

This is to certify that the undersigned has this day filed the foregoing document electronically with the United States District Court for the Eastern District of Virginia with electronic service to all counsel and parties of record.

Dated: March 4, 2026.

/s/ John Nassikas
John Nassikas

11