# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ASHLEY J. TELLIS, | ) | Case No. 1:25-cr-00308-MSN |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| | ) | |
| | ) | |

## REPLY IN SUPPORT OF DEFENDANT ASHLEY J. TELLIS' MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT..................................................................................................................... 2

    I.    The Indictment Fails Because Section 793(e) Does Not Reach an Entrusted Official Such as Dr. Tellis. ............................................................................................................. 2

    II.    Section 793's Legislative History Confirms Dr. Tellis Does Not Fall Under Subsection (e)…. .......................................................................................................................... 6

    III.    Section 1924 Was Enacted to Fill the Gap in Section 793. ......................................... 11

    IV.    The Case Law the Government Cites Does Not Support Its Position. ......................... 14

    V.    The Rule of Lenity Applies................................................................................... 19

CONCLUSION................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Healthkeepers, Inc. v. Richmond Ambulance Auth.*,
642 F.3d 466 (4th Cir. 2011) ..............................................................................................3

*INS v. Chadha*,
462 U.S. 919 (1983)............................................................................................................10

*Lee v. Norfolk S. Ry. Co.*,
802 F.3d 626 (4th Cir. 2015) ..............................................................................................6

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019)............................................................................................................10

*Papasan v. Allain*,
478 U.S. 265 (1986)..............................................................................................................4

*Perrin v. United States*,
444 U.S. 37 (1979)................................................................................................................8

*Russell v. United States*,
369 U.S. 749 (1962)..............................................................................................................5

*Russello v. United States*,
464 U.S. 16 (1983)................................................................................................................9

*United States v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023) ...............................................................................................4

*United States v. Drake*,
2011 WL 2653850 (D. Md. 2010) ......................................................................................14

*United States v. Glenn*,
No. 14-cr-80031 (S.D. Fla. Jul. 15, 2014) ........................................................................18

*United States v. Hooker*,
841 F.2d 1225 (4th Cir. 1988) .............................................................................................4

*United States v. Hung*,
629 F.2d 908 (4th Cir. 1980) ...............................................................................1, 3, 6, 19

*United States v. Martin*,
No. 17-cr-00069-RDB (D. Md. Jul. 19, 2019)...............................................................15, 16

ii

*United States v. McGuinness*,
33 M.J. 781 (N-M. C.M.R. 1991) ............................................................................18

*United States v. McGuinness*,
35 M.J. 149 (Ct. Mil. App. 1992) .....................................................................16, 17

*United States v. Mehalba*,
No. 03-cr-10343 (D. Mass. Mar. 4, 2005) ..............................................................18

*United States v. Miserendino*,
283 F. Supp. 3d 489 (E.D. Va. 2017) .......................................................................4

*United States v. Morison*,
844 F.2d 1057 (4th Cir. 1988) ...........................................................14, 15, 16, 20

*United States v. Morison*,
Crim. No. Y-84-00455 (D. Md. 1985)....................................................................16

*United States v. Munn*,
595 F.3d 183 (4th Cir. 2010) ..................................................................................19

*United States v. Nghia Hoang Pho,*
No. 1:17-cr-631 (D. Md. Dec. 1, 2017) ..................................................................19

*United States v. Nirala*,
No. 16-cr-00124 (E.D. Va. May 5, 2016)................................................................18

*United States v. Perry*,
757 F.3d 166 (4th Cir. 2014) ....................................................................................4

*United States v. Serageldin*,
No. 18-cr-10436 (D. Mass. Jul. 18, 2020) ..............................................................18

*United States v. Schulte*,
578 F. Supp. 3d 596 (S.D.N.Y. 2021)...............................................................16, 17

*United States v. Steele*,
2011 WL 414992 (Army Ct. Crim. App. Feb. 3, 2011) .....................................16, 17

*United States v. Sterling*,
860 F.3d 233 (4th Cir. 2017) ...............................................................3, 14, 15, 17

*United States v. Sterling*,
No. 10-cr-485 (Aug. 17, 2015) .................................................................................3

*United States v. Thomas*,
367 F.3d 194 (4th Cir. 2004) ....................................................................................4

iii

**Statutes**

18 U.S.C. § 793(d) .................................................................................................. *passim*

18 U.S.C. § 793(e) .................................................................................................. *passim*

18 U.S.C. § 793(f)............................................................................................................9

18 U.S.C. § 1924..................................................................................................... *passim*

Pub. L. 115-118, § 202, 132 Stat. 3 (2018)...................................................................11

40 Stat. 218 (1917)...........................................................................................................6

64 Stat. 1004 (1950).........................................................................................................7

**Court Rules**

Fed. R. Crim. P. 12(b)(3)(B)(v) ......................................................................................2

**Legislative Materials**

96 Cong. Rec. 14,178 (1950)........................................................................................7, 8

140 Cong. Rec. 22,048 (1994)........................................................................................12

Cong. Rsch. Serv., RS21900, The Protection of Classified Information: The Legal
    Framework  2 (2008) ................................................................................................9

*Hearings on Amendment to S. 595 Before the Subcomm. of the S. Comm. on the
    Judiciary*, 81st Cong. 1 (1949) .............................................................................7, 8

*Hearings on Amendment to S. 595 Before the Subcomm. of the S. Comm. on the
    Judiciary*, 81st Cong. 2 (1949) ............................................................................7, 10

S. Rep. No. 427, 80th Cong., 1st Sess. (1949)...............................................................10

S. Rep. No. 296, 103d Cong., 2d Sess. (1994)..........................................................11, 13

**Executive Orders**

Exec. Order No. 8381, 5 Fed. Reg. 1147 (Mar. 26, 1940).............................................9

Exec. Order No. 10290, 16 Fed. Reg. 9795 (Sept. 27, 1951) ....................................9, 13

**Other Authorities**

CIA, Memorandum of Agreement (Example) (Oct. 22, 1979), bit.ly/4sOS1Xc............9

Dir. of Cent. Intel. Directive 1/21, *Physical Security Standards for Sensitive Compartmented Information Facilities* (Jul. 29, 1994), bit.ly/4sRfEhR ...................................9

U.S. Intelligence Board, Physical Security Standards for Compartmented Information Facilities (Apr. 30, 1970), bit.ly/3NK5fFV ..........................................................9

**INTRODUCTION**

The government rests the entire theory of its case on an anachronistic reading of the term "unauthorized"—a term the Fourth Circuit has recognized is at least a "possible ambiguity." *United States v. Hung*, 629 F.2d 908, 919 n.10 (4th Cir. 1980).  That ambiguity must be resolved by reference to the statute's text, structure, and history—not by importing contemporary security rules into a decades-old statute.  That ambiguity also requires that the Court's resolution be governed by the rule of lenity.

Applying those interpretive tools here, the statutory mismatch is clear.  The government chose to charge Dr. Tellis under 18 U.S.C. § 793(e), which applies to persons in "unauthorized" possession of, access to, or control over national-defense information ("NDI").  But the indictment itself alleges something different:  that Dr. Tellis held the requisite security clearance, was authorized to review classified information up to the TOP SECRET/SCI level, and was "entrusted" with access to national-defense information through his government service.  Those allegations place him, if anywhere, in the class Congress addressed in Section 793(d)—and later in Section 1924—not in Section 793(e).

The government's opposition does not cure that defect.  It sidesteps the Fourth Circuit's test for authorized possession, insists that the Court ignore the indictment's own factual allegations, and relies on cases involving defendants who had no authorization whatsoever to access or possess the information *at any location*.  Its reading would also erase the line Congress drew between entrusted custodians and unauthorized possessors, collapse Sections 793(d) and (e), and render Section 1924 largely superfluous.

The text forecloses that result, and the legislative history confirms why: until 1950, all prosecutions under the relevant provision of Section 793—whether the possessor was lawful or

1

unlawful, entrusted or otherwise—were encompassed in a single subsection that required proof that the government had made a demand for the documents and that the defendant failed to deliver the documents on demand.  That was a serious obstacle:  when an outsider wrongfully took documents without the knowledge of anyone in the government, the government would not even know it should make a demand.  Section 793(e) was added in 1950 to dispense with the demand requirement for these unknown, unauthorized outsiders.  But it was not drafted to cover entrusted insiders who could lawfully access the information within the scope of their employment.  Decades later, Congress realized that it needed to dispense with the demand requirement even in some instances of entrusted insiders.  But Congress did not remedy that flaw by amending Section 793. Rather, Congress enacted Section 1924 precisely because it understood unauthorized removal and retention by entrusted officials to be a gap in the law left by Section 793.

Because the superseding indictment pleads facts that must be accepted as true, and those facts negate, rather than establish, the "unauthorized" element of Section 793(e), it fails to state an offense and must be dismissed.

## ARGUMENT

I.    **The Indictment Fails Because Section 793(e) Does Not Reach an Entrusted Official Such as Dr. Tellis.**

The superseding indictment should be dismissed because it does not establish an essential element of a Section 793(e) offense: that Dr. Tellis had "unauthorized" possession of, access to, or control over the charged NDI.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  The indictment's own allegations place Dr. Tellis in the class of entrusted or lawful custodians governed by subsection (d), not in the class of unauthorized possessors governed by subsection (e).  The text and structure of Section 793 make that distinction clear.  Subsection (d) applies to persons "lawfully having possession of, access to, control over, or being entrusted with" NDI and criminalizes retention only

2

when the person "fails to deliver it on demand." 18 U.S.C. § 793(d). Subsection (e), by contrast, applies to persons "having unauthorized possession of, access to, or control over" such information and contains no demand requirement. *Id.* § 793(e). Congress thus drew a deliberate line between entrusted or lawful custodians, on the one hand, and unauthorized possessors, on the other. The distinction between the two subsections is critical here because the government never made a demand on Dr. Tellis.

The Fourth Circuit has already approved our approach: that "authorized possession" under the statute turns on having "an appropriate security clearance" and having "gained access to the document because it was necessary to the performance of [the Defendant's] official duties." *United States v. Hung*, 629 F.2d 908, 919 n.10 (4th Cir. 1980). The government does not dispute this test—or make any mention of it—and instead argues that there are "separate ground[s] under which [a defendant] may have unauthorized possession." Gov't's Opp. to Def.'s Mot. to Dismiss at 6 n.1 ("Opp."), ECF No. 83.[1] But reading Section 793(e) to encompass an individual whom the indictment itself describes as entrusted—and who held his clearance during the alleged retention— would collapse the line the statute draws, render the phrase "or being entrusted with" superfluous, and permit the government to nullify Section 793(d)'s demand requirement simply by relabeling entrusted possession as "unauthorized" whenever it alleges improper storage. The Court should not allow the government to twist the statute that way; instead, courts must give "full effect" to the statute as written. *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 471–72 (4th Cir. 2011).

---

[1] To support their stance, the government cites the jury instructions (at 1541) in *United States v. Sterling*, No. 10-cr-485 (Aug. 17, 2015) (ECF 493). But the defendant there retained documents at his residence *after* he left his employment and his clearance was terminated—and thus was not authorized to possess those documents in *any* location. *United States v. Sterling*, 860 F.3d 233, 239 (4th Cir. 2017).

The government's threshold response—that an indictment cannot be dismissed if it tracks the language of the statute, i.e., it "set[s] forth the offense in the words of the statute itself," Opp. 3—essentially asks the Court to look only at its recitation of the statutory language and ignore the factual allegations that contradict it. But once the government details any of the facts in the indictment, Dr. Tellis is entitled to ask the Court to decide whether the facts the government itself chose to plead can state an offense under Section 793(e). That legal question is properly resolved on a motion to dismiss. *See United States v. Hooker*, 841 F.2d 1225, 1227–28 (4th Cir. 1988) (en banc) (dismissal is appropriate when, assuming the truth of the allegations in the indictment, the government would not establish an element of the offense); *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004) (same). And while the Court must accept well-pleaded facts as true, it is not required to accept the government's bare legal conclusion that Dr. Tellis had "unauthorized possession" where the indictment's factual allegations show the opposite—namely, that he held the requisite security clearance and was entrusted with access to NDI through his government service. *See United States v. Brewbaker*, 87 F.4th 563, 579 (4th Cir. 2023) ("[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

Even where, as here, an indictment recites the elements of a claim, it nevertheless fails to state an offense "if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Miserendino*, 283 F. Supp. 3d 489, 491 (E.D. Va. 2017) (citation omitted). The Fourth Circuit has made clear that statutory labels do not suffice: "any general description based on the statutory language must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (cleaned up);

4

*see also Russell v. United States*, 369 U.S. 749, 765 (1962) (where an offense is defined in generic terms, the indictment must "descend to particulars" (citation omitted)).  The government cannot avoid that review by simply tracking the language of the statute while alleging facts inconsistent with the statutory elements.

The government alleges facts that belie the statutory allegation.  Notably, the government does not deny that Dr. Tellis had the requisite clearance.  Nor does it contend that Dr. Tellis lacked a need to know.  *See also* Opp. 6 n.1 ("The Government has . . . not made any representations about the Defendant's need to know.").  Regardless, the counts of the indictment specifically identify the government's legal theory of the case:  that Dr. Tellis had "unauthorized possession" *because* he allegedly retained NDI "at his residence without authorization."  Indictment ¶ 21 ("having unauthorized possession of [NDI], . . . *to wit*, [Dr. Tellis] retained documents relating to the national defense at his residence without authorization." (emphasis added)).  The absence of any pleaded allegation that Dr. Tellis lacked clearance, lacked need to know, or otherwise obtained or accessed the documents unlawfully or without authorization underscores the problem:  the indictment offers Section 793(e)'s statutory conclusion of "unauthorized possession," but only facts that would place Dr. Tellis in the category of entrusted possessors under Section 793(d).

Finally, the government's attempt to distinguish entrusted "access" and entrusted "possession" misses the point.  Opp. 5–6.  Section 793(d) expressly covers persons "lawfully having possession of, access to, [or] control over" NDI, as well as those "entrusted with" it.  18 U.S.C. § 793(d).  The subsection draws no distinction between entrusted access and entrusted possession; it covers both.  The government's own framing—that Dr. Tellis was entrusted "to 'access' and authoriz[ed] to 'view' sensitive material," Opp. 6—therefore confirms, rather than undermines, that he falls within subsection (d)'s category of entrusted custodians.

5

Because the government chose the wrong subsection and the indictment does not allege facts establishing the essential "unauthorized" element of Section 793(e), the indictment fails to state an offense and must be dismissed.

## II.    Section 793's Legislative History Confirms Dr. Tellis Does Not Fall Under Subsection (e).

The text and structure of the statute make clear that Dr. Tellis falls outside the ambit of Section 793(e).  Moreover, the legislative history of Section 793 decisively confirms that Section 793(e) does not apply to authorized possessors of classified documents who retained those documents in unauthorized locations.  *See Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015) (courts may "look to other indicia of congressional intent such as the legislative history to interpret the statute" if the statute "lends itself to more than one reasonable interpretation" (citation omitted)); *see also Hung*, 629 F.2d at 919 n.10 (recognizing a "possible ambiguity" in the phrase "unauthorized possession").  The government's suggestion that the "legislative history of Section 793 . . . supports [its] read of the statute," Opp. 15, is mistaken.  History points the other way.

As originally enacted in 1917, subsection (d) applied to persons "*lawfully or unlawfully* having possession of, access to, control over, or being *intrusted* with" NDI, and required a demand and refusal for *all* persons before retention liability attached.  40 Stat. 218 (1917) (emphases added).  There was no liability in any situation, whether lawful or unlawful, unless and until there was a demand.  All possessors, lawful and unlawful, were covered by the same subsection.  That changed when Congress made the decision to pull out one category of offender—the unlawful possessor—from this catch-all provision and create a distinct provision for what Congress called the "unauthorized" possessor.  Thus, when Congress amended Section 793 through the Internal Security Act of 1950, it drew a deliberate distinction between entrusted or lawful possessors on the one hand, and unauthorized possessors on the other, by removing the words "or unlawfully"

6

from subsection (d) and creating subsection (e).  *See* 64 Stat. 1004 (1950).  Subsection (e) applied to "unauthorized" possessors and omitted the demand requirement.  In other words, subsection (e) removed some category of persons from subsection (d), while all other persons (lawful or entrusted possessors) remained in (d), subject to the demand requirement.

The 1950 reports and hearings show that subsection (e) was added not to convert entrusted insiders into unauthorized possessors whenever they mishandled storage rules, but to address a different problem: individuals whose possession was unauthorized in the first instance and might never come to the government's attention, thereby depriving the government of the opportunity to make the requisite demand—"since by the very nature of things an unauthorized possession would most likely not be known."  96 Cong. Rec. 14,178 (1950) (statement of Sen. McCarran); *see also Hearings on Amendment to S. 595 Before the Subcomm. of the S. Comm. on the Judiciary*, 81st Cong. 2, at 67 (1949) ("793 Hearings II") ("We are trying to deal with people who are trying to destroy the United States Government and not people who are trying to get information that they are legally entitled to have.").  Subsection (e) also applies to former government employees, "if a person went out of the service of the Government, and took with him documents that he did not have a right to have in his possession."  *Hearings on Amendment to S. 595 Before the Subcomm. of the S. Comm. on the Judiciary*, 81st Cong. 1, at 36 (1949) ("793 Hearings I") (statement of Tom Clark, Att'y Gen. of U.S.).

Senator Pat McCarran, who sponsored the bill, described the "remedial attention" that led to subsection (e) by invoking the well-known "Chambers pumpkin papers" episode.  96 Cong. at 14,178.  That example is telling.  Under existing law, Whittaker Chambers—an outsider who secretly possessed and hid NDI in a pumpkin—"could not be charged with a crime in respect of his possession of the pumpkin papers until a person entitled to receive those items made a demand

7

upon him for their delivery, and then only if he refused the demand." *Id.* Subsection (e) was enacted to close that loophole by criminalizing retention by such unauthorized possessors without requiring a demand. *See id.* ("This situation is corrected by [subsection (e)]."). That is a very different problem than the one alleged here, where the indictment itself alleges that Dr. Tellis held a security clearance, was authorized to view classified material up to the TOP SECRET/SCI level, and was entrusted with access to NDI in connection with his government service. The 1950 amendment did not address that scenario, and consequently the entrusted possessor remained where it had previously been: covered by the provision that does not criminalize until there is a demand, subsection (d).

The government nevertheless asserts that subsection (e) was intended to penalize "all forms of unauthorized possession" regardless of the possessor's status. Opp. 16. But that formulation begs the question. The dispute is not whether subsection (e) reaches unauthorized possession; of course it does. The question is what Congress meant by "unauthorized" possession "*at the time*" it amended the statute, *Perrin v. United States*, 444 U.S. 37, 42 (1979) (emphasis added), when it simultaneously preserved subsection (d) for lawful and entrusted possessors.

The legislative history answers that question by identifying the problem subsection (e) was meant to solve: when an unknown person obtains NDI that the person is not authorized to receive. Nothing in the 1950 history suggests that Congress intended to make location an operative factor or to allow the government to bypass subsection (d)'s demand requirement whenever an entrusted insider later mishandled the storage of information he was authorized to access.

Indeed, at the time Congress was considering the 1950 amendment, legislators and the Attorney General acknowledged that government employees "very often" would "carry [classified information] home in a brief case," which they concluded was "[o]f course" "lawful." 793

Hearings I at 36 (statements of Sen. Ferguson and Tom Clark, Att'y Gen. of U.S.).   That understanding reflects the practical reality of the period: the modern classification safeguarding infrastructure—including formalized secure facilities such as SCIFs—did not yet exist,[2] and Congress therefore did not equate possession outside a government facility with "unauthorized possession" within the meaning of the statute.   But that's not to say that Congress did not know how to address unauthorized locations at the time—Congress did so expressly in subsection (f), when addressing removal from a "proper place of custody."  18 U.S.C. § 793(f).  The inclusion of "proper place of custody" in subsection (f) underscores that had Congress wanted to criminalize removal to an improper or unauthorized place of custody in subsection (e), Congress could have and would have done so.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).   And as we explain below, Congress later chose to address expressly unauthorized removal and retention in Section 1924 based on an "unauthorized location."  18 U.S.C. § 1924.  The decision to add Section 793(e) without any reference to location is telling.

---

[2] Uniform standards for safeguarding classified information were first developed in 1951, the year *after* the 1950 amendments.  *See* Exec. Order No. 10290, 16 Fed. Reg. 9795 (Sept. 27, 1951).  In 1940, President Franklin D. Roosevelt issued the first executive order addressing a classification regime, but only for "Certain Vital Military and Naval Installations and Equipment."  *See* Exec. Order No. 8381, 5 Fed. Reg. 1147 (Mar. 26, 1940).  Before, all "decisions regarding classification of national security information were left to military regulation." Cong. Rsch. Serv., RS21900, The Protection of Classified Information: The Legal Framework  2 (2008).  The 1970s saw an emergence of physical security standards for compartmented information facilities.  *See, e.g.*, U.S. Intelligence Board, Physical Security Standards for Compartmented Information Facilities (Apr. 30, 1970), bit.ly/3NK5fFV; CIA, Memorandum of Agreement (Example) (Oct. 22, 1979), bit.ly/4sOS1Xc.  The directive for more modern SCIFs was issued in 1994. Dir. of Cent. Intel. Directive 1/21, *Physical Security Standards for Sensitive Compartmented Information Facilities* (Jul. 29, 1994), bit.ly/4sRfEhR.

When discussing the amendment's applicability, the Attorney General—who requested the bill[3]—was emphatic:  "We mean by 'unlawful' that someone has secured control of this information outside the scope of his duties surreptitiously, or some other way."  793 Hearings II at 37.  And when discussing how the government would prove "unauthorized" possession, the Attorney General explained that instead of having to prove the elements of a crime (such as "bribery, or something like that"), the evidence could focus on authorization (or lack thereof) itself.  *Id.* at 40–41.  For example, proof that the defendant's "position or occupation would show that he had no authority to have" the information, or testimony from the official responsible for the material that he "had not authorized [the defendant] to have it."  *Id.* at 41.  The issue was not *where* the information was stored—in a pumpkin or otherwise—but *whether* that person was authorized to have it.  *See also id.* at 44 (Sen. Miller: "There would be a statute with respect to removing records anyway, would there not?"  Att'y Gen. Clark: "I do not know of one at the present time.");  *id.* at 26 (a person would violate subsection (e) "if he got [the NDI] in an unauthorized way").

The government's theory that a person may move back and forth between subsection (d) and subsection (e) depending on where he stores material he was entrusted to access is anachronistic.  The amendment Congress adopted in 1950 did not focus on location, but on how the possessor first got hold of the documents.  It therefore does not reach the conduct alleged here—which remains under subsection (d) and is criminalized only if a demand is made and refused.  Courts are not free to "invest old statutory terms with new meanings," which would effectively amend the statute outside the legislative process "the Constitution commands."  *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (quoting *INS v. Chadha,* 462 U.S. 919, 951

---

[3] *See* S. Rep. No. 427, 80th Cong., 1st Sess., at 6 (1949) ("The bill was introduced at the request of the Attorney General . . . .").

(1983)). The government's attempt to expand "unauthorized" possession beyond its historical understanding should therefore be rejected.

### III. Section 1924 Was Enacted to Fill the Gap in Section 793.

The government next argues that "Defendant's interpretation of Sections 793(d) and (e) would leave an incomprehensible gap in the statute, allowing clearance holders who would otherwise be entitled to possess or review" NDI "to remove it from government facilities . . . without consequence unless and until the government demanded return of the material." Opp. 14. The government is right. This was a huge problem—one which Congress expressly recognized when enacting Section 1924. Section 1924's legislative history confirms that this conduct was not previously criminalized, and Congress enacted Section 1924 (not Section 793(e)) to do just that.

In 1994, in the wake of Aldrich Ames,[4] Congress acknowledged that there was "a widespread problem within the Executive branch" of "unauthorized removal and retention of classified documents." S. Rep. No. 296, 103d Cong., 2d Sess., at 41 (1994). At that time, "Executive regulations . . . prohibit[ed] such conduct," but those "regulations appear[ed] to provide little deterrence to federal employees." *Id.* The Senate Select Committee on Intelligence concluded that "[m]aking such conduct a criminal offense, albeit a misdemeanor, would . . . have a far more effective impact."[5] *Id.* Surely the Committee would not have thought that a misdemeanor would have a "far more effective impact" to deter unlawful removal and retention if Section 793(e)—a criminal felony enacted over 40 years prior—already applied to such conduct.

---

[4] In 1994, Aldrich Ames, a CIA employee for 31 years, was charged with espionage after spying for the Soviet Union, and later for Russia, for nearly a decade. S. Rep. No. 103-296, at 17 (1994). This was "perhaps the most serious" breach of security "ever experienced by the CIA" and "served as a considerable impetus for new legislation." *Id.* at 17, 19.

[5] Section 1924 was a misdemeanor until it was amended in 2018 to be a felony. Pub. L. 115-118, § 202, 132 Stat. 3, 19 (Jan. 19, 2018).

11

Congress was not ignorant of the application of Section 793 when it enacted Section 1924. The Committee noted that "under some circumstances the type of conduct contemplated by [Section 1924] might be prosecuted under subsection 793(d)." *Id.* at 41. Significantly, the Committee referred only to subsection (d), *not* subsection (e). Under the existing statutory framework, an employee who removed classified materials and retained them in an "unauthorized location" could be prosecuted under Section 793(d), but only if the government discovered the documents, demanded their return, and the employee "refused." *Id.* at 42. "Conversely, any officer or employee who did cooperate and willingly returned the classified materials to Government control when asked to do so could not be prosecuted under section 793(d)." *Id.* But the "Committee believe[d] that where classified information is involved, the fact that a government officer or employee is willing to surrender such information when he or she has been discovered by the Government should not absolve such officer or employee from possible criminal liability, as now appears to be the case under section 793(d)." *Id.*

Because the unauthorized removal and retention of classified information "necessarily creates a substantial risk of unauthorized disclosure and damage to the national security," the Committee concluded it "*should* carry potential criminal liability," *id.* (emphasis added)—a conclusion driven by its recognition that, under existing law, "*there is no penalty, by law, if you take something outside.*" 140 Cong. Rec. 22,048 (1994) (statement of Sen. DeConcini) (emphasis added). That gap—where entrusted officials knowingly removed classified documents but returned them when confronted—was precisely the conduct Congress sought to criminalize through Section 1924.

The government's reliance on Section 1924's use of "classified information" as evidence of Congress' intent to criminalize "distinct conduct" from that in Section 793—which addresses

12

information "relating to the national defense"—misses the point. *See* Opp. 17–18. Yes, Section 793 talks in terms of national defense information and uses the term "willfully," while Section 1924 talks in terms of classified information and uses the term "knowingly." But nothing in the legislative history (at least that we are aware of) suggests that Congress enacted Section 1924 to broaden the category of protected information beyond NDI or to lower the applicable *mens rea*. What the legislative history does discuss, however, is the specific gap left by Section 793(d)'s demand requirement that Congress intended to fill in enacting Section 1924. *See, e.g.*, S. Rep. No. 103-296, at 41 (willingness "to surrender such information when [a demand is made] should not absolve [an] officer or employee from possible criminal liability, as now appears to be the case under section 793(d)."). It is true that while virtually all NDI is classified, much if not most of what is classified is not NDI. But the terminology difference in the statutes is explained by history, not substance.

When Congress enacted the Espionage Act in 1917, the modern executive-branch classification system did not yet exist. *See* Exec. Order No. 10290, 16 Fed. Reg. 9795 (Sept. 27, 1951) (establishing modern classification system). Thus it chose a statutory concept of harm and sensitivity—"relating to the national defense"—rather than a later executive label. By 1994, however, Congress was legislating against the backdrop of a well-developed modern classification system, so Section 1924 naturally used the terminology of that system. Therefore, although "classified information" and NDI are different elements of proof, Section 1924's use of "classified information" does not suggest that the purpose of the statute was to address that difference. It simply reflects the classification regime in place in 1994, in contrast to the Espionage Act, which Congress legislated against the backdrop of the system in place in 1917.

### IV.    The Case Law the Government Cites Does Not Support Its Position.

The government insists that courts have settled that Section 793(e) applies to authorized possessors of NDI who retained those documents in unauthorized locations.  But *every single case* the government cites in support of their position involved a critical factual difference that justified the application of Section 793(e) in those cases, but not here: the defendants in those cases were not authorized to possess the documents at issue in *any* location, and thus were not "entrusted." None of the government's cases held that a clearance holder who was entrusted with the charged documents became an "unauthorized" possessor under Section 793(e) simply by taking those documents to an unauthorized location.  Nor did any of those decisions analyze or even address the meaning of "entrusted" under the statute, much less confront the question presented here— whether an entrusted, authorized possessor becomes "unauthorized" solely by virtue of alleged improper storage.

The government points to four decisions from within the Fourth Circuit to suggest that "government clearance holders may be criminally prosecuted under Section 793(e) . . . if they remove national defense information from secure areas."  Opp. 9.  All four cases involved defendants who were not authorized to receive or possess the classified NDI *in any place*.  *See United States v. Morison*, 844 F.2d 1057, 1061 (4th Cir. 1988) (defendant swiped and transmitted documents marked "Secret" that were "on the desk of *another* employee in the vaulted area where he worked" (emphasis added)); *United States v. Sterling*, 860 F.3d 233, 239 (4th Cir. 2017) (former CIA employee retained classified documents at his home *after* his employment and clearance was terminated); Crim. Info. at 1, *United States v. Drake*, 2011 WL 2653850 (D. Md. 2010) (defendant "intentionally exceeded his authorized use of [NSA] computers . . . and obtained information from NSANet to provide said information orally and in written form to another not permitted or authorized to receive said information"); Sentencing Transcript 16:3-5, *United States v. Martin*,

14

No. 17-cr-00069-RDB (D. Md. Jul. 19, 2019) (ECF No. 222) ("The government would proffer to the Court that much of this material was far outside of the subject matter of the defendant's work assignments.").

Two of these cases are also readily distinguishable—and much more serious—because the defendants were charged with willful *transmission* of NDI to unauthorized persons, not mere retention. *See Morison*, 844 F.2d at 1061–62 (defendant leaked classified information to the press); *Sterling*, 860 F.3d at 239 (same). Sections 793(d) and (e) *both* criminalize the willful transmission of NDI to anyone not authorized to possess it. Both impose the same penalties and neither impose a "demand" requirement on willful transmission, in contrast to retention. The only difference between these transmission offenses, then, is that Section 793(d) applies to "lawful" possessors and Section 793(e) to "unauthorized" possessors. It would be dangerous to draw any conclusions about the meaning of the word "unauthorized" from these cases because any defendant who is charged with a Section 793(e) transmission offense has no incentive to challenge their status as an "unauthorized possessor"—because the government could always re-indict them as a lawful possessor who transmitted NDI under Section 793(d) anyway, and seek the same penalties. The same is not true for willful *retention* offenses, because Section 793(d) adds an additional element: that the possessor retained documents even after a "demand" was made for their return.

The government nevertheless attempts to paint *Morison*—a transmission case where the defendant was *never* authorized to possess the materials—as supporting their position that Section 793(e) "covers 'anyone,'" including those who possess NDI "in a location which is contrary to law or regulations for the conditions of his employment." Opp. 10. But the government misconstrues the *Morison* decision. The legal dispute in *Morison* did not center on the definition

15

of "unauthorized."[6]  The defendant contended that Sections 793(d) and (e) criminalize only cases of "classical spying," *i.e.*, cases involving agents of a foreign power.  844 F.2d at 1064.  The defendant argued that since he transmitted NDI to a "news organization" and "not to an agent of a foreign power," his case did not "fit within the mold of 'classical spying.'"  *Id.*  The Fourth Circuit rejected this argument, given the statute "includes no limitation to spies" and "declare[s] no exemption in favor of one who leaks to the press."  *Id.* at 1063.  Thus, when the Fourth Circuit said the statute "covers 'anyone,'" it meant that Sections 793(d) and (e) are not limited to "classic" espionage cases involving foreign agents.  *See id.* at 1063–64.  *Morison*'s language cannot be stretched to mean that Section 793(e) applies to authorized possessors who take documents home.

With no remaining supportive case law in the circuit, the government cites a single out-of-circuit district court opinion and two decisions from non-Article III courts.  *See United States v. Schulte*, 578 F. Supp. 3d 596 (S.D.N.Y. 2021); *United States v. Steele*, 2011 WL 414992, at *3 (Army Ct. Crim. App. Feb. 3, 2011); *United States v. McGuinness*, 35 M.J. 149, 153 (Ct. Mil. App. 1992).  All of these cases are flatly inapposite.

First, *Schulte* reasoned that "a rational juror could find unlawful possession" where it was undisputed that the defendant "was not authorized to possess classified information at" a correctional center.  578 F. Supp. 3d at 616.  The government suggests this means that the defendant was not authorized to retain the documents at "*a particular place*."  Opp. 8.  But the

---

[6] The government highlights a single line in the trial transcript of *Morison*: in which the judge said that "an individual has unauthorized possession of documents and writings when he possesses under circumstances or in a location which is contrary to law or regulation for the conditions of his employment."  Trial Tr. 194:20–24, *United States v. Morison*, Crim. No. Y-84-00455 (D. Md. 1985) (attached as Ex. 1 to Dkt. 91 in *United States v. Martin*, No. 17-cr-00069-RDB (D. Md. Mar. 3, 2018)).  That one-off statement—in another district, forty years ago—cannot support the government's position.  The documents at issue in *Morison* were not within the scope of the defendant's work, as the defendant had swiped them from the desk of another employee.  *See* 844 F.2d at 1061.

16

defendant there—charged with unauthorized transmission and access, *not* retention—"accessed a computer without authorization and in excess of his authorization," meaning he was *never* authorized to possess the documents *in any location*.  Superseding Indictment at 5, *Schulte*, No. 17-cr-548 (S.D.N.Y. June 8, 2020) (ECF No. 405).  Moreover, the defendant "disclosed classified information *while incarcerated*," after he was fired by the CIA, in a self-declared "information war" against the United States that he conducted via a "contraband cell phone in prison."  *Schulte*, 578 F. Supp. 3d at 607–09 (emphasis added).  Thus, there was "no dispute" that the defendant "was not authorized to possess classified information" at the prison.  *Id.* at 616.

The government remarks that *Schulte* cites *Sterling* "for the proposition that 'keeping classified information at a defendant's home [was] sufficient to support conviction under § 793.'"  Opp. 13 (quoting *Schulte*, 578 F. Supp. at 616).  But the defendant in *Sterling* had been fired from the CIA in 2002, and classified documents were found in his home in 2006—meaning his work duties no longer authorized him to possess these documents in *any* place.  860 F.3d at 239.  Indeed, "[a]s the majority notes . . . there was ample evidence from which the jury could reasonably infer that Sterling took 'unauthorized possession of' the [NDI] *when he left his employment* with the CIA" and "illegally retained it in his home" before giving it to a journalist.  *Id.* at 249 (Traxler, J., concurring in part) (emphasis added).  The *Schulte* court's characterization of *Sterling*—in a one-sentence parenthetical—does not fully reflect the decision's underlying facts or reasoning.

Nor do the government's remaining two non-Article III decisions support their case.  First, *Steele*—an unpublished, non-precedential military court decision—involved a defendant who maintained an "enormous collection" of NDI in his personal possession "*months after* he left his position" that gave him access to that information.  2011 WL 414992 at *5 (emphasis added).  Second, *McGuinness* involved a vagueness challenge to the term "unauthorized."  35 M.J. 149 (Ct.

17

Mil. App. 1992). While the Court of Military Appeals rejected the vagueness challenge, the court below recognized that the term "may be open to [more than one] interpretation" and looked to the legislative history to resolve the ambiguity, albeit the lower court's interpretation of "[c]ongressional intent and purpose," 33 M.J. 781, 785 (N-M. C.M.R. 1991), was inconsistent with Congress's actual intent and understanding, as articulated in Congress's deliberations over both Section 793 and Section 1924, in which Congress identified that an authorized possessor's retention of documents in an unauthorized location was a gap in the law that needed to be filled.

Finally, in his opening brief, Dr. Tellis identified multiple cases in which the government accepted plea deals under Section 1924 for similar conduct, from similarly situated defendants. The government attacks Dr. Tellis' citations as "selective," contending they "overlook the multiple other cases involving federal clearance holders that have been resolved by plea under Section 793(e) for willful retention of national defense information at the defendant's residence." Opp. 18. But of the six cases the government cites, four involved allegations that the defendant was not "entrusted" with or authorized to possess the classified documents in any location.[7] One of the two remaining plea deals remains sealed, leaving the government's "unauthorized" theory unverified. *See United States v. Mehalba*, No. 03-cr-10343 (D. Mass. Mar. 4, 2005) (ECF No. 99). That leaves one, or at most two, plea deals in which a defendant was entrusted with access to documents but brought them to an unauthorized location. *See United States v. Nghia Hoang Pho,*

---

[7] *See* Sentencing Transcript at 16:3-5, *Martin*, No. 1:17-cr-69 ("[M]uch of this material was far outside of the subject matter of the defendant's work assignments."); Gov't Sentencing Mem. at 8, *United States v. Serageldin*, No. 18-cr-10436 (D. Mass. Jul. 18, 2020) (ECF No. 72) ("The documents included a project that he did not work on."); Indictment ¶ 5–6, *United States v. Nirala*, No. 16-cr-00124 (E.D. Va. May 5, 2016) (ECF No. 13) (classified documents found at defendants' home *after* his security clearance lapsed); Second Superseding Indictment Counts 5–7 ¶ 2, *United States v. Glenn*, No. 14-cr-80031 (S.D. Fla. Jul. 15, 2014) (ECF No. 47) (defendant "knowingly and intentionally exceeded authorized access to a computer").

18

No. 1:17-cr-631 (D. Md. Dec. 1, 2017) (ECF No. 9). But a plea agreement for allegedly similar conduct is evidence of neither a statute's plain meaning nor congressional intent.

Accordingly, the government's authorities show only that Section 793(e) is not limited to "classic" espionage and can reach leaks or possession by those who were never authorized—or who lost their clearance—to hold the documents. They do not support extending Section 793(e) to a custodian who was "entrusted" with the materials and removed them to an unauthorized location. Congress addressed that separate removal-and-retention scenario in Section 1924. The government cannot now rewrite Section 793(e) to cover "lawful" or "entrusted" possessors.

## V.    The Rule of Lenity Applies.

If there were any doubt that Section 793(e) applies only to possessors who were not authorized to retain NDI in any location, that ambiguity would have to be resolved in Dr. Tellis' favor anyway. When a penal statute is ambiguous, courts are "*obliged* to apply the rule of lenity and resolve the conflict in the defendant's favor." *United States v. Munn*, 595 F.3d 183, 194 (4th Cir. 2010). While the parties do not dispute that the term "entrusted" is unambiguous, the Fourth Circuit has acknowledged that the term "unauthorized possession" presents a "possible ambiguity." *Hung*, 629 F.2d at 919 n.10.

In a breezy footnote, the government urges this Court to disregard *Hung*'s statement about the ambiguity of the term "unauthorized possession" as "dicta." Opp. 9 n.3. But the sole reason that statement was dicta is because the Circuit determined that the trial judge "provided adequate content for the phrase" by instructing the jury that *authorized* possession under Section 793 is defined as (1) having "an appropriate security clearance" and (2) "gain[ing] access to the document because it was necessary to the performance of his official duties." *Hung*, 629 F.2d at 919 n.10. The Circuit thus did not *need* to apply the rule of lenity, because the best reading of the term "unauthorized possession" resolved in the defendant's favor anyway—the same standard that we

19

advocate for here, under which Section 793(e) does not reach entrusted possessors who retained NDI in unauthorized locations.

The government further presses this Court to disregard *Hung* because, in *United States v. Morison*, the Fourth Circuit determined that "the terms of this statute are unambiguous on their face." Opp. 9–10. This again misconstrues the point of the *Morison* decision. The Fourth Circuit there was not saying that the term "unauthorized possession" was unambiguous. Instead, as discussed above, the defendant contended that Sections 793(d) and (e) criminalize only cases of "classical spying," *i.e.*, cases involving agents of a foreign power, and not disclosure to the press. *Morison*, 844 F.2d at 1064. Accordingly, the Fourth Circuit's determination that the "language of the two statutes" was "unambiguous" was only insofar as it clearly applies to individuals who transmitted NDI to the press—not just those falling into the "classical spying" mold. *Id.* To the extent the Court sees any ambiguity, then, it must be resolved in Dr. Tellis' favor.

## CONCLUSION

For the reasons set forth above, the indictment should be dismissed with prejudice.

20

Dated: March 18, 2026.

Respectfully submitted,

*/s/ John Nassikas*
John Nassikas (No. 24077)
Baruch Weiss (admitted *pro hac vice*)
Bonnie Devany (admitted *pro hac vice*)
Aaron X. Sobel (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-6820
Telephone: (202) 942-6819
Telephone: (202) 942-6834
Telephone: (202) 942.5212
john.nassikas@arnoldporter.com
baruch.weiss@arnoldporter.com
bonnie.devany@arnoldporter.com
aaron.sobel@arnoldporter.com

*Attorneys for Ashley J. Tellis.*

21

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this day filed the foregoing document electronically with the United States District Court for the Eastern District of Virginia with electronic service to all counsel and parties of record.

Dated: March 18, 2026.

*/s/ John Nassikas*
John Nassikas

22